# IN THE SUPREME COURT OF CALIFORNIA

DANA HOHENSHELT,

Petitioner,

v.

THE SUPERIOR COURT OF LOS ANGELES COUNTY,

Respondent;

GOLDEN STATE FOODS CORP.,

Real Party in Interest.

S284498

Second Appellate District, Division Eight
B327524

Los Angeles County Superior Court
20PSCV00827

August 11, 2025

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Kruger, Groban, and Evans concurred.

Justice Groban filed a concurring opinion, in which Justice Evans concurred.

Justice Corrigan filed a dissenting opinion, in which Justice Jenkins concurred.

HOHENSHELT v. SUPERIOR COURT

S284498


Opinion of the Court by Liu, J.


The question here is whether the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) preempts California Code of Civil Procedure section 1281.98, a provision of the California Arbitration Act (CAA; Code Civ. Proc., § 1280 et seq.) that governs the payment of fees in employment and consumer arbitrations. (All undesignated statutory references are to the Code of Civil Procedure.) Section 1281.98 establishes a default rule that when the party who drafted an arbitration agreement is responsible for paying fees and costs to an arbitrator, that party must pay an arbitrator's invoice "within 30 days after the due date" (§ 1281.98, subds. (a)(1)), and "the arbitration provider shall issue all invoices to the parties as due upon receipt" (*id.*, subd. (a)(2)). The parties may contract around the default rule by specifying in their agreement "the number of days in which the parties to the arbitration must pay any required fees or costs" or by agreeing to an "extension of time for the due date." (*Ibid.*) If the drafting party fails to make timely payment, it "waives its right to compel the employee or consumer to proceed with that arbitration" (*id.*, subd. (a)(1)), and the employee or consumer may choose to "withdraw the claim from arbitration" and proceed in court (*id.*, subd. (b)(1)) or "[c]ontinue the arbitration" if the arbitrator agrees (*id.*, subd. (b)(2)).

We hold that section 1281.98, properly construed, is not preempted by the FAA. Although section 1281.98 has been

1

interpreted by various Courts of Appeal to impose an inflexible and sometimes harsh rule resulting in loss of arbitral rights, we reject that rigid construction and instead conclude that the statute does not abrogate the longstanding principle, established by statute and common law, that one party's nonperformance of an obligation automatically extinguishes the other party's contractual duties only when nonperformance is willful, grossly negligent, or fraudulent. As explained below, the Legislature sought to deter companies and employers from engaging in *strategic* nonpayment of arbitration fees; we find no indication that it intended to strip companies and employers of their contractual right to arbitration where nonpayment of fees results from a good faith mistake, inadvertence, or other excusable neglect.

So understood, the operation of section 1281.98 does not deviate from "generally applicable state law contract principles." (*Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 572 (*Quach*); see *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 650 (*Viking River*).) Nor does it "disfavor[] arbitration" or "interfere[] with fundamental attributes of arbitration" (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 341, 344 (*Concepcion*)), or "invent special, arbitration-preferring procedural rules" (*Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 418 (*Morgan*)). Instead, the statute aims to ensure that arbitration fees are paid in a timely manner so that parties to an arbitration agreement can move forward in arbitration. (See *Dean Witter Reynolds Inc. v. Byrd* (1985) 470 U.S. 213, 221 ["The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered . . . ."].)

## I.

On July 31, 2018, real party in interest Golden State Foods Corporation (Golden State) hired plaintiff Dana Hohenshelt as a sanitation employee. Prior to his start date, Hohenshelt signed a "pre-dispute resolution agreement" providing that "all claims" against Golden State concerning his employment "shall be submitted to final and binding arbitration in accordance with the rules of" a "mutually selected" arbitration organization, and that "such arbitration shall be governed by the Federal Arbitration Act." That agreement also provided that while his employer "shall not be responsible for [Hohenshelt's] attorney's fees, witness fees, court reporter fees, deposition costs, or initial filing fee," Golden State "will pay all other reasonable fees and costs unique to arbitration as well as the costs of the arbitrator."

According to Hohenshelt, in late 2019 he reported to his superiors that a sanitation lead was sexually harassing one of his coworkers. When management failed to take action, he reported the harassment to Golden State's operations director and senior human resources manager. Hohenshelt alleges that Golden State subsequently retaliated and ultimately terminated him in April 2020.

In November 2020, Hohenshelt sued Golden State in superior court, alleging discriminatory retaliation, failure to prevent harassment and retaliation, and various Labor Code violations. Golden State moved to compel arbitration and stay court proceedings, which Hohenshelt did not oppose. The superior court granted the motion, and in August 2021, arbitration commenced through JAMS. The arbitrator billed

Golden State a $7,000 "preliminary deposit to cover the expense of all pre-hearing work," which Golden State paid.

The arbitration proceeded for approximately one year. Upon setting the date for a final hearing, the arbitrator issued an invoice to Golden State for $32,300 on July 29, 2022, followed by another invoice for $11,760 on August 29 of the same year. On September 30, JAMS sent a letter to both parties stating that it "has not yet received full payment of the fees" and that "[p]ursuant to [its] fee and cancellation policy" a failure to pay by October 28 could subject the hearing to cancellation. Because more than 30 days had passed since the July 29 and August 29 invoices, Hohenshelt filed a motion in superior court on September 30 asserting that Golden State was " 'in default of the arbitration' " and that he was electing to "withdraw his claims 'from arbitration and proceed in . . . court.' "

Shortly thereafter, Golden State paid the fees and sent an email objecting to Hohenshelt's request to withdraw from arbitration, noting that he could not "point to any delays or burdens whatsoever that have occurred in its case" and that he had "waived any technical objections to continuing" by "fully engaging in arbitration" thus far. Golden State also noted that on July 7, 2022, JAMS had informed the parties that the arbitrator would be unavailable from August 8 through September 18, 2022 and had asked that any "urgent matters" should be submitted to her "no later than July 25, 2022." The invoices were issued after July 25, and Golden State's counsel claimed that his "office was unaware that these invoices had been issued given the arbitrator's previously issued Notice of unavailability." "The invoices were also issued during a time that [counsel] was preparing to go out on paternity leave," which

counsel "had communicated to JAMS, the arbitrator and Plaintiff's counsel on multiple occasions prior to July 2022."

At a subsequent hearing on his motion to lift the stay of court proceedings, Hohenshelt responded that section 1281.98, as interpreted by the Courts of Appeal, neither required nor permitted " 'an inquiry into the reasons for a drafting party's nonpayment.' " (Quoting *Williams v. West Coast Hospitals, Inc.* (2022) 86 Cal.App.5th 1054, 1074 (*Williams*).)  In any event, Hohenshelt said, the invoices "are issued electronically," and "there was actually substantial activity in this precise case over [the] time frame" that Golden State's counsel suggested he was unavailable, including a deposition attended by counsel on August 4, 2022.

The trial court denied Hohenshelt's motion to lift the stay of court proceedings.  It interpreted *Gallo v. Wood Ranch USA, Inc.* (2022) 81 Cal.App.5th 621 (*Gallo*) as establishing a rule that the drafting party has 30 days following the arbitration provider's deadline to pay fees before forfeiting its right to continue with the arbitration.  In the trial court's view, "the arbitrator seemingly set a new due date of October 28, 2022," and Golden State paid within 30 days.  (Boldface and underscoring omitted.)

The Court of Appeal reversed.  Observing that "both [the July 29 and August 29] invoices provide that payment is 'due upon receipt,' " the court said "the trial court's ruling ignored the clear language of section 1281.98, subdivision (a)(2), which expressly provides that '[a]ny extension of time for the due date shall be agreed upon by all parties.' " (*Hohenshelt v. Superior Court* (2024) 99 Cal.App.5th 1319, 1322, 1324 (*Hohenshelt*).)  That provision " ' "would have no meaning, force, or effect" ' " if

the arbitrator could simply issue a "new due date" without the other party's consent. (*Id.* at p. 1324.) Thus, Golden State's payment was untimely and resulted in "material breach" under section 1281.98. (*Hohenshelt*, at p. 1325.)

The Court of Appeal then turned to Golden State's argument "that section 1281.98 is preempted by the [FAA]." (*Hohenshelt*, *supra*, 99 Cal.App.5th at p. 1325.) Adopting the reasoning in *Gallo*, the court held that section 1281.98 is not preempted because its procedures " '*further* — rather than *frustrate* — the objectives of the FAA to honor the parties' intent to arbitrate and to preserve arbitration as a speedy and effective alternative forum for resolving disputes.' " (*Hohenshelt*, at pp. 1325–1326, quoting *Gallo*, *supra*, 81 Cal.App.5th at p. 630.) Although section 1281.98 has the effect of ending arbitration in this case, the court reasoned, "[o]ther employers presumably would take note of this incentive to speed up the arbitration." (*Hohenshelt*, at p. 1326.) By incentivizing faster proceedings, the timely payment procedures are " 'a friend of arbitration and not its foe.' " (*Ibid.*, quoting *Gallo*, at p. 645.) Accordingly, the Court of Appeal granted Hohenshelt's petition and directed the trial court to lift the stay.

Justice Wiley dissented. Because "[n]o other contracts are voided on a hair trigger basis due to tardy performance," he explained, the CAA's payment rules single out arbitration and are preempted. (*Hohenshelt*, *supra*, 99 Cal.App.5th at p. 1328 (dis. opn. of Wiley, J.); see *id.* at p. 1329 ["A friend of arbitration does not make the arbitration agreement unenforceable. Federal law does not allow a state to save arbitration by destroying it."].)

6

We granted review to resolve whether the FAA preempts section 1281.98.  With one exception, the Courts of Appeal have upheld the CAA's payment provisions against preemption challenges.  (Compare *Hernandez v. Sohnen Enterprises, Inc.* (2024) 102 Cal.App.5th 222, 243 (*Hernandez*) [finding preemption] with *Gallo, supra*, 81 Cal.App.5th at pp. 629–630 [no preemption], *Espinoza v. Superior Court* (2022) 83 Cal.App.5th 761, 783–784 (*Espinoza*) [same], *De Leon v. Juanita's Foods* (2022) 85 Cal.App.5th 740, 753–754 [same], *Suarez v. Superior Court* (2024) 99 Cal.App.5th 32, 41–42 [same], *Keeton v. Tesla, Inc.* (2024) 103 Cal.App.5th 26, 37, review granted and held Sept. 11, 2024 [same].)  The federal district courts are split, with one published opinion finding preemption.  (See *Belyea v. Green Sky, Inc.* (2022) 637 F.Supp.3d 745, 759 (*Belyea*).)

## II.

As an initial matter, we note that Golden State's briefing before us contends that section 1281.98, whether preempted or not, "do[es] not apply because the parties unambiguously agreed [in the contract] to be bound by the FAA and JAMS' rules."  Hohenshelt says section 1281.98 applies because " 'the procedural provisions of the CAA apply in California courts by default' " (quoting *Valencia v. Smyth* (2010) 185 Cal.App.4th 153, 174), and the Attorney General as amicus curiae suggests that state law does not permit parties to opt out of the CAA's payment provisions.  Golden State did not raise this argument in the trial court or the Court of Appeal, and neither court addressed it.  Moreover, whether the parties did, or whether they may, opt out of the CAA is distinct from the issue on which Golden State sought our review — namely, "whether sections 1281.97 *et seq.* are preempted."  Accordingly, we decline to

address the belated contention that the CAA does not apply here. We assume the CAA applies and proceed to examine the issue on which we granted review.

Congress enacted the FAA in 1925 to "ensure the enforceability . . . of private agreements to arbitrate" and "encourage the expeditious resolution of disputes." (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 476, 478 (*Volt*).) Section 2 of the FAA provides that a written arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided [under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (9 U.S.C. §§ 401–402)]." (9 U.S.C. § 2.) This provision was designed " 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,' [citation], and to place such agreements ' "upon the same footing as other contracts." ' " (*Volt*, at p. 478.)

Section 2 of the FAA contains two parts. First, the "enforcement mandate" sets out a general rule that "renders agreements to arbitrate enforceable as a matter of federal law." (*Viking River*, *supra*, 596 U.S. at p. 650.) Second, as an exception to that rule, the "saving clause . . . permits invalidation of arbitration clauses on grounds applicable to 'any contract.' " (*Ibid.*) Together, the enforcement mandate and saving clause "establish 'an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ' " (*Ibid.*)

Other provisions of the FAA set forth default procedures for arbitration in the absence of an explicit agreement. For example, the section covering the appointment of arbitrators provides that in the absence of a contractually agreed-upon method, the court will appoint a single arbitrator. (9 U.S.C. § 5.) But because the procedures in the FAA are not comprehensive, every state has enacted its own arbitration act to fill in gaps left by the FAA. (See Derner & Haydock, *Confirming an Arbitration Award* (1997) 23 Wm. Mitchell L.Rev. 879, 882–883, fn. 19.) Those state rules govern so long as they are consistent with the FAA's mandate that "an agreement in writing to submit to arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist . . . for the revocation of any contract." (9 U.S.C. § 2; see *Volt, supra,* 489 U.S. at p. 476 ["There is no federal policy favoring arbitration under a certain set of procedural rules . . . ."].)

California's procedures governing arbitration date back to 1851, when the Legislature first provided that "[p]ersons capable of contracting may submit to arbitration any controversy which might be the subject of a civil action between them, except a question of title to real property in fee or for life." (Stats. 1851, ch. 4, § 380, p. 111.) That statute outlined, among other things, the power of an arbitrator "to appoint a time and place for hearing," to hear witnesses and evidence, and to issue an award. (*Id.,* § 383, p. 112.) But a contractual agreement to submit to arbitration was deemed revocable. (See, e.g., *Holmes v. Richet* (1880) 56 Cal. 307, 312; *M. E. Church v. Seitz* (1887) 74 Cal. 287, 291.) For an arbitration agreement to become irrevocable and thus judicially enforceable, an order had to be first secured from a court. (Stats. 1851, ch. 4, §§ 382, 385, p. 112.)

California's contemporary approach to arbitration originated two years after Congress enacted the FAA. In 1927, the Legislature amended existing arbitration provisions to "reject[] the common law hostility to the enforcement of arbitration agreements" and "provide[] a modern, expeditious method of enforcing such agreements and awards made pursuant to them." (Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. G-5 (1960 Recommendations).) Central to the 1927 amendments was the directive, modeled after section 2 of the FAA, that written arbitration agreements " ' "shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." ' " (*Clogston v. Schiff-Lang Co.* (1935) 2 Cal.2d 414, 415, quoting former § 1280; see § 1281.)

The next major overhaul occurred in 1961 when the California Law Revision Commission proposed revisions that modernized arbitration procedure while retaining "the basic principles of the present California arbitration statute." (1960 Recommendations, *supra,* at p. G-5; see Feldman, *Arbitration Modernized – the New California Arbitration Act* (1961) 34 S.Cal. L.Rev. 413, 416.) Since then, California has continued to modify or build on its existing procedures. (See, e.g., §§ 1281.85 [requiring neutral arbitrators to comply with specific ethics standards], 1281.9 [requiring neutral arbitrators to make specific disclosures], 1281.91 [giving parties the right to disqualify neutral arbitrators based on their disclosures], 1282.5 [right to transcriptions in arbitrations], 1286.2 [limiting judicial review of arbitration awards], 1288 [100 days to file petitions to vacate or correct an award], 1288.2 [100 days to respond to a petition to vacate or correct an award], 1294 [allowing appeals

from orders dismissing or denying motions to compel arbitration, but not from orders granting such motions].)

In 2019, the Legislature passed Senate Bill No. 707 (2019–2020 Reg. Sess.) (Senate Bill 707), the statute at issue here, in response to "a concerning and troubling trend" in consumer and employment arbitrations: "employers are refusing to pay required fees to initiate arbitration, effectively stymieing the ability of employees to assert their legal rights." (Sen. Judiciary Com., Analysis of Sen. Bill No. 707 (2019–2020 Reg. Sess.) as amended Apr. 11, 2019, p. 6 (Senate Judiciary Committee Analysis); Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill. No. 707 (2019–2020 Reg. Sess.) as amended May 20, 2019, p. 4 (Senate Rules Committee Analysis).) The Legislature noted instances in which companies, having drafted and enforced waivers of class proceedings in employment contracts, faced large numbers of individual arbitration demands and then failed to timely pay arbitration fees, thereby frustrating adjudication of employees' claims. (Sen. Judiciary Com. Analysis, *supra*, at pp. 6–7.) The Legislature observed, for example, that 2,800 Chipotle workers filed a class action against Chipotle in 2013 and were ordered to individually arbitrate their claims. (*Id.* at p. 7.) After the trial court rebuked Chipotle's request to suspend the arbitration, Chipotle "continued to frustrate the efforts of its employees to have their claims adjudicated by failing to pay its share of the filing fee." (*Id.* at pp. 7–8.) "Six years later not a single claim ha[d] been heard." (*Id.* at p. 8.)

According to the Legislature, "existing case law" did "not provide clear remedies for employees or consumers who are caught in limbo by unpaid arbitration fees," and "this lack of clarity mean[t] that a drafting party [could] avoid the

consequences of their behavior by not paying for the dispute to be arbitrated." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 707 (2019–2020 Reg. Sess.) as amended May 20, 2019, p. 7 (Assembly Committee on Judiciary Analysis).) The Legislature thus enacted Senate Bill 707 to "solve a very specific problem — namely, the ' "procedural limbo and delay" ' that consumers and employees face when they are ' "forced to submit to mandatory arbitration to resolve [a] . . . dispute," ' and the business or company that pushed the case into an arbitral forum then ' "stalls or obstructs the arbitration proceeding by refusing to pay the required fees." ' " (*Gallo, supra*, 81 Cal.App.5th at p. 634, quoting Sen. 3d reading analysis of Sen. Bill No. 707 (2019–2020 Reg. Sess.) as amended May 20, 2019, p. 2.) In addressing this problem, the Legislature "narrowly target[ed] those who are most at risk" of "extreme hardship" from "needlessly delay[ed] arbitration" — namely, consumers and employees, whose "livelihood may be the subject of the adjudication." (Assem. Com. on Judiciary Analysis, *supra*, at pp. 8–9, boldface and italics omitted.)

Senate Bill 707 added section 1281.98 to the CAA. Section 1281.98 governs payment of fees during an ongoing arbitration. It provides that where "an employment or consumer arbitration . . . requires . . . the drafting party" to "pay certain fees and costs," those fees or costs must be "paid within 30 days after the due date." (§ 1281.98, subd. (a)(1).) If the fees are not timely paid, "the drafting party is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel the employee or consumer to proceed with that arbitration as a result of the material breach." (*Ibid.*) The consumer or employee may then "unilaterally elect" to "[w]ithdraw the claim from arbitration and proceed in a court of

appropriate jurisdiction" (*id.*, subd. (b)(1)) or "[c]ontinue the arbitration proceeding, if the arbitration provider agrees to continue administering the proceeding, notwithstanding the drafting party's failure to pay fees or costs" (*id.*, subd. (b)(2)).

After the passage of Senate Bill 707, litigants disputed what counts as the "due date" after which the 30-day payment period begins to run. (Sen. Judiciary Com., Analysis of Sen. Bill No. 762 (2021–2022 Reg. Sess.) as amended Mar. 9, 2021, p. 5.) In addition, the drafting party could repeatedly ask for extensions, each time resetting the clock for when payment was due without the other party's awareness or consent. (*Ibid.*) To address these issues, the Legislature passed Senate Bill No. 762 (2021–2022 Reg. Sess.), which modified section 1281.98 to state that arbitrators must promptly issue their invoices and that invoices are "due upon receipt" unless the parties have adopted "an express provision in the arbitration agreement stating the number of days in which the parties to the arbitration must pay any required fees or costs." (§ 1281.98, subd. (a)(2).) Further, Senate Bill No. 762 added a sentence that says: "Any extension of time for the due date shall be agreed upon by all parties." (§ 1281.98, subd. (a)(2).)

## III.

To address the preemption issue, we begin by examining the operation of section 1281.98. In construing this statute, " ' "our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " ' " (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.) "We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' . . . [W]e construe

the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." ' " (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)  We also "construe every statute with reference to the whole system of law of which it is a part, so that all may be harmonized and anomalies avoided." (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1089 (*Coachella Valley*); see *Stafford v. Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805.)  "This rule applies although the statutes to be harmonized appear in different codes." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274, fn. 7 (*Bozung*).)  Further, in the preemption context, we adhere to "the rule that courts should, if reasonably possible, construe a statute 'in a manner that avoids *any* doubt about its [constitutional] validity.' " (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 346, original brackets; see *id.* at pp. 345–346 [construing Bus. & Prof. Code, § 17529.5, subd. (a)(2) to avoid "significant preemption problems"]; *County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292, 298 [preemption is a constitutional issue].)

## A.

The premise of Golden State's preemption argument is that section 1281.98 imposes an inflexible rule that deems any failure to make timely payment a material breach, regardless of circumstances, with the automatic consequence that the drafting party loses its arbitral rights.  Several courts have read the statute this way.  (See, e.g., *Williams, supra,* 86 Cal.App.5th at p. 1074 ["nothing in section 1281.98 as drafted depends on the intent or good faith of a particular drafting party in a specific case"]; *Colon-Perez v. Security Industry Specialists, Inc.* (2025) 108 Cal.App.5th 403, 418 (*Colon-Perez*) [§ 1281.98's " 'bright

line' " rule does not permit discretionary relief under § 473, subd. (b) for mistake, inadvertence, or excusable neglect]; *Keeton v. Tesla, Inc.*, *supra*, 103 Cal.App.5th at p. 40; *Doe v. Superior Court* (2023) 95 Cal.App.5th 346, 357; see also *Gallo*, *supra*, 81 Cal.App.5th at p. 644 [similarly strict reading of § 1281.97, which governs initial payment of arbitration fees]; *Espinoza*, *supra*, 83 Cal.App.5th at pp. 775–777.) According to Golden State, courts have interpreted section 1281.98 as an "unambiguous legislative mandate that 'requires strict enforcement' and provides for 'no exceptions,' " with "[t]he result . . . that objectively insignificant conduct is legislatively decreed to be 'material' and amount to 'waiver' of an important contractual right." Because this strict approach "elevate[s] every arbitration agreement to a higher plane than all (or nearly all) contracts," Golden State contends, it violates the FAA's equal-treatment principle and is preempted.

It is true that the text of section 1281.98 says without exception that if a drafting party does not make timely payment, it "is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel [arbitration]" (§ 1281.98, subd. (a)(1)), and the consumer or employee may "[w]ithdraw . . . from arbitration and proceed in . . . court" (*id.*, subd. (b)(1)). It is also true the statute has been applied strictly, regardless of whether an untimely payment was deliberate or inadvertent. (E.g., *Colon-Perez*, *supra*, 108 Cal.App.5th at pp. 409–410, 413, 421, fn. 12 [loss of arbitral rights where counsel was "caught in the throes of a natural disaster" and payment was six days late]; *Doe v. Superior Court, supra*, 95 Cal.App.5th at p. 350 [payment was mailed within the 30-day period but arrived two days late].)

But we do not think the language of section 1281.98 is by itself dispositive of the statute's operation and effect. As noted, "we construe every statute with reference to the whole system of law of which it is a part, so that all may be harmonized and anomalies avoided" (*Coachella Valley*, *supra*, 35 Cal.4th at p. 1089), and "our primary goal is to determine and give effect to the underlying purpose of the law" (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332). We undertake such harmonization even when the "plain language" of a statute directs one thing while a background statute specifies another. (*In re Greg F.* (2012) 55 Cal.4th 393, 400, 411.) "When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like 'notwithstanding any other law' or 'notwithstanding other provisions of law.' " (*Id.* at p. 406.) The Legislature has not done so here.

Instead, the Legislature enacted section 1281.98 against the backdrop of longstanding statutes that authorize courts to prevent unjust forfeitures of contractual rights. One such statute is Civil Code section 3275. Generally, "[w]hen a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277.) Civil Code section 3275 codifies an equitable exception: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." (See *Ebbert v. Mercantile Trust Co. of California* (1931) 213 Cal. 496, 499; *Magic Carpet Ride*

16

*LLC v. Rugger Investment Group, L.L.C.* (2019) 41 Cal.App.5th 357, 368 (*Magic Carpet*).) Under this provision, a nonperforming party is not entitled to relief from forfeiture when its delay was willful, fraudulent, or grossly negligent. But "when it appears that [the party] has acted in good faith, given some reasonable excuse for the delay, and thereafter tendered performance promptly and with reasonable diligence," equity can excuse nonperformance so long as the breaching party can and does "adequately compensate[]" the nonbreaching party for any harm caused by the delay. (*Hopkins v. Woodward* (1932) 216 Cal. 619, 622; see *Ebbert*, at p. 500.)

Civil Code section 3275 excuses a failure to perform an "obligation," which is defined as "a legal duty, by which a person is bound to do or not to do a certain thing." (Civ. Code, § 1427.) "An obligation arises either from" a contract or from "[t]he operation of law." (*Id.*, § 1428.) The requirement to timely pay arbitration fees under section 1281.98 is a legal duty that arises from the operation of law and is thus an "obligation" within the meaning of these statutes. If Civil Code section 3275 is operative as a background statute here, then a drafting party that has not acted willfully, fraudulently, or with gross negligence in making a late payment "may be relieved" from forfeiting their right to continue the arbitration "upon making full compensation to the other party" for any losses resulting from the delay. (Civ. Code, § 3275; see *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603 ["Damages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract."].) Consistent with this compensation requirement, the CAA "order[s] the drafting party to pay the reasonable

expenses, including attorney's fees and costs, incurred by the employee or consumer as a result of the material breach." (§ 1281.99, subd. (a).)

Another exception to the general forfeiture rule appears in Civil Code section 1511, which provides that a breach may be excused when performance of the contractual obligation would be impossible, illegal, or impracticable "because of extreme and unreasonable difficulty, expense, injury, or loss involved." (*Oosten v. Hay Haulers Dairy Emp. & Helpers Union* (1955) 45 Cal.2d 784, 788; see Civ. Code, § 1511 ["The want of performance of an obligation . . . is excused . . . [w]hen such performance . . . is prevented or delayed . . . [(1)] by operation of law . . . or [(2)] by an irresistible, superhuman cause, or by the act of public enemies of this state or of the United States."]; *Baird v. Wendt Enterprises, Inc.* (1967) 248 Cal.App.2d 52, 55.) Like Civil Code section 3275, Civil Code section 1511 excuses nonperformance "of an obligation." But whereas Civil Code section 3275 provides for relief from forfeiture while requiring compensatory damages, Civil Code section 1511 fully excuses the nonperforming party when its conditions are met. (See *Ontario Deciduous Fruit-Growers' Assn. v. Cutting Fruit-Packing Co.* (1901) 134 Cal. 21, 25.)

A third relevant statute is section 473, subdivision (b) (section 473(b)), which says: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." This provision for discretionary relief "ha[s] been in place since the 1800's" (*Lee v. Wells Fargo Bank, N.A.* (2001) 88 Cal.App.4th 1187, 1192 (*Lee*)), and "this court has given a very liberal interpretation to the provisions of

this section" (*In re Simmons' Estate* (1914) 168 Cal. 390, 396). As early as 1914, we summarized various cases in which relief had been granted under section 473, noting that they were all "cases in which a step in a pending action or proceeding was required by the Code to be taken within a specified time, and the holding, in each instance, was that the objection to the belated taking of such step was a 'proceeding taken against' the delaying party, and that relief might be given him under section 473." (*In re Simmons' Estate*, at p. 396.)

Section 473(b) "applies to *any* 'judgment, dismissal, order, or other proceeding.'" (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 254.) It has been interpreted from "[v]ery early on" to encompass "the failure of counsel to meet a procedural deadline." (*Lee*, *supra*, 88 Cal.App.4th at p. 1193; see *id.* at pp. 1188–1189 [upholding trial court's award of discretionary relief under § 473 to excuse an untimely request for fees and costs].) And it has been applied to judgments that are not defaults or dismissals of the underlying case. (See *Elston v. City of Turlock* (1985) 38 Cal.3d 227, 232 [holding that § 473 can excuse a party's failure to timely respond to a request for admissions, avoiding the "deemed admissions" that would otherwise result].) Moreover, it has been applied to relieve a defendant from an arbitration award after proceedings were conducted in the defendant's absence. (See *MJM, Inc. v. Tootoo* (1985) 173 Cal.App.3d 598, 601; see also *Austin v. Los Angeles Unified School Dist.* (2016) 244 Cal.App.4th 918, 930 [§ 473(b) relief available where one party asked the court "to set aside the judgment and the order granting the [other party's] summary judgment motion so she could have a fair opportunity to submit opposition papers demonstrating the existence of triable issues of fact and the potential merit of her claims"]; *Minick v. City of*

*Petaluma* (2016) 3 Cal.App.5th 15, 18 [upholding trial court's grant of discretionary relief under § 473(b) where counsel was suffering from a serious illness when preparing the summary judgment opposition papers which "led him to overlook readily available evidence"].)

In light of this broad construction of section 473(b), and assuming the statute has not been displaced here, a judicial determination that an employee or consumer is entitled to withdraw from arbitration and "proceed in . . . court" (§ 1281.98, subd. (b)(1)) is readily understood as an "order . . . taken against [the drafting party]" as well as a "proceeding taken against [the drafting party]" (§ 473(b)).  Section 473(b) may provide another path by which a drafting party that does not timely pay fees can be relieved from forfeiting its right to arbitration.

**B.**

When a statute is enacted against a "legal backdrop," we assume the background legal rules continue to apply absent a "definitive indication" that the Legislature intended to displace them.  (*In re Friend* (2021) 11 Cal.5th 720, 734.)  "The Legislature is presumed to be aware of all laws in existence when it passes or amends a statute" (*In re Greg F.*, *supra*, 55 Cal.4th at p. 407), and "[r]epeals by implication are disfavored" (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 637).  Where "[n]either statute expressly refers to the other[,] [o]ur task is to harmonize the two statutes."  (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663.)  We have undertaken such harmonization whether the statutes are in the same code or different codes.  (See, e.g., *In re Greg F.*, at p. 407 ["For over 40 years, [Welfare and Institutions Code] section 782 has given juvenile courts the power to dismiss a delinquency petition if doing so serves the

interests of justice and the welfare of the minor. [Citation.] If the Legislature had intended to deprive courts of this long-held discretionary power when a dismissal would conflict with [Welfare and Institutions Code section 733, subdivision (c)], it could have easily made this intent plain. It did not."]; *Coachella Valley*, *supra*, 35 Cal.4th at p. 1090 [harmonizing the Myers-Milias-Brown Act as part of a larger system of other public employment relations laws]; *Mejia v. Reed*, at p. 663 [harmonizing the Uniform Fraudulent Transfer Act with Fam. Code, § 916]; *Bozung*, *supra*, 13 Cal.3d at p. 274 [harmonizing the California Environmental Quality Act and the Knox-Nisbet Act].)

The question here is whether there is a clear indication that section 1281.98 was intended to limit the ordinary operation of section 473(b) or Civil Code sections 3275 and 1511. The question is not whether section 1281.98's language or legislative history indicates an intent to preserve the operation of these background legal rules (see dis. opn., *post*, at p. 6); as noted, it is settled that background rules apply absent a "definitive indication" of the Legislature's intent to displace them. (*In re Friend*, *supra*, 11 Cal.5th at p. 734.) The Court of Appeal in *Colon-Perez* held that "the excuse-laden inquiry required for discretionary relief under section 473(b) is incompatible with the 'simple bright-line' rule set forth in section 1281.98 and the Legislature's purpose in enacting it." (*Colon-Perez*, *supra*, 108 Cal.App.5th at p. 419.) And several Courts of Appeal have concluded that the Legislature intended strict enforcement of the payment provisions with "[n]o [e]xceptions." (*Espinoza*, *supra*, 83 Cal.App.5th at p. 775, italics omitted; see *ante*, at p. 14 [citing cases]; dis. opn., *post*, at pp. 7–

21

12.) But this overreads the Legislature's purpose in enacting the payment provisions.

In the text of Senate Bill 707, the Legislature stated among its findings and declarations: "(e) In Brown v. Dillard's, Inc. (2005) 430 F.3d 1004, the United States Court of Appeals for the Ninth Circuit held that, under federal law, an employer's refusal to participate in arbitration pursuant to a mandatory arbitration provision constituted a breach of the arbitration agreement. In Sink v. Aden Enterprises, Inc. (2003) 352 F.3d 1197, the Ninth Circuit held that, under federal law, an employer's failure to pay arbitration fees as required by an arbitration agreement constitutes a material breach of that agreement and results in a default in the arbitration. [¶] (f) It is the intent of the Legislature in enacting this measure to affirm the decisions in . . . Brown v. Dillard's, Inc., and Sink v. Aden Enterprises, Inc. that a company's failure to pay arbitration fees pursuant to a mandatory arbitration provision constitutes a breach of the arbitration agreement and allows the non-breaching party to bring a claim in court." (Stats. 2019, ch. 870, § 1, subd. (f).)

Given the Legislature's express intent to affirm *Brown v. Dillard's, Inc.* (2005) 430 F.3d 1004 (*Brown*) and *Sink v. Aden Enterprises, Inc.* (2003) 352 F.3d 1197 (*Sink*), the facts and holdings of those decisions are instructive. In *Brown*, an employee claiming wrongful termination (Brown) had attempted to initiate arbitration as required by her employment contract, but her employer (Dillard's) refused to pay its portion of arbitration fees. (*Brown*, at pp. 1008–1009.) "For more than two months, Brown tried to contact Dillard's to discuss its refusal to participate in arbitration. She was not successful until October 2002, when she enlisted the aid of her mother and

arranged a telephone conference call with Savage [an employee in Dillard's legal department]. During that call, Savage told Brown that her complaint had no merit and that Dillard's refused to arbitrate." (*Id.* at p. 1009.) The Ninth Circuit concluded that "[u]nder general principles of California contract law, Dillard's breach of its obligations under the arbitration agreement deprives it of the right to enforce that agreement." (*Id.* at p. 1010.) Alternatively, if analyzed "as a waiver case," Dillard's waived its right to enforce the arbitration agreement because it clearly had knowledge of the employee's right to compel arbitration, acted inconsistently with that right, and prejudiced the employee through its delay. (*Id.* at p. 1012.)

In *Sink*, the employee (Sink) had sued his employer (Aden) for unpaid compensation. (*Sink*, *supra*, 352 F.3d at p. 1198.) "Because of an arbitration clause in [the] employment agreement, the district court . . . stayed Sink's action and referred the matter to arbitration." (*Ibid.*) The parties scheduled the arbitration and agreed in June 2001, with written confirmation, that Aden would prepay fees to the arbitration organization by August 6, 2001. (*Id.* at pp. 1198–1199.) Despite multiple notices, "Aden did not pay these costs by August 6, 2001 and gave no prior notice that it would be unable to pay. Further, Aden did not present any evidence that at the time payment was due in the arbitration, Aden made genuine efforts to make alternate payment arrangements." (*Id.* at p. 1199.) The district court found that Aden had defaulted in the arbitration and accordingly lifted the stay of arbitration, but Aden argued that the court should have instead "order[ed] the parties to return to arbitration." (*Id.* at p. 1200.)

The Ninth Circuit rejected this argument: "Accepting Aden's reading of the FAA would also allow a party refusing to

cooperate with arbitration to indefinitely postpone litigation. Under Aden's interpretation, the sole remedy available to a party prejudiced by default would be a court order compelling a return to arbitration. The same offending party could then default a second time, and the prejudiced party's sole remedy, again, would be another order compelling arbitration. This cycle could continue, resulting in frustration of the aggrieved party's attempts to resolve its claims. One purpose of the FAA's liberal approach to arbitration is the efficient and expeditious resolution of claims. [Citations.] This purpose is not served by requiring a district court to enter an order returning parties to arbitration upon the motion of a party that is already in default of arbitration. Another, and preeminent, purpose of the FAA is to ensure 'judicial enforcement of privately made agreements to arbitrate.' [Citation.] But this purpose also is not served by returning parties to arbitration upon the motion of a party that is in default of arbitration. Aden's failure to pay required costs of arbitration was a material breach of its obligations in connection with the arbitration. Aden had a fair chance to proceed with arbitration, but Aden scuttled that prospect by its non-payment of costs, impeding the arbitration to the point where the arbitrator cancelled the arbitration and declared Aden in default. In these circumstances, we hold that § 4 of the FAA does not compel a district court to return the parties once more to arbitration." (*Sink, supra*, 352 F.3d at p. 1201.)

As the facts of these cases make clear, the Legislature was concerned about cases where *willful* nonpayment of fees by a defendant stymies the ability of employees and consumers to have their claims resolved in arbitration pursuant to a pre-dispute arbitration agreement. Neither *Brown* nor *Sink* involved any suggestion of excusable neglect or good faith effort

by the defendant to make timely payment. The employer in *Brown* simply "refus[ed] to arbitrate" (*Brown, supra,* 430 F.3d at p. 1012), and *Sink* also involved "a party refusing to cooperate with arbitration" (*Sink, supra,* 352 F.3d at p. 1201; see Assem. Com. on Judiciary Analysis, *supra,* at p. 8). In both cases, the courts expressed concern about nonpayment of fees as a "tactic" (*Brown,* at p. 1012) to "indefinitely postpone" (*Sink,* at p. 1201) resolution of employee or consumer claims. The Legislature's express focus on cases of manipulative or intentional delay does not support the view that section 1281.98 was intended to curtail the operation of extant statutes excusing nonperformance in circumstances not involving willful, fraudulent, or grossly negligent conduct.

Consistent with *Brown* and *Sink,* the legislative history of Senate Bill 707 identifies the willful withholding of fees as the mischief it sought to remedy. The Senate Rules Committee noted that the "bill seeks to affirm that when a company *refuses* to pay fees required under an employment or consumer arbitration agreement it is in material breach of the arbitration agreement . . . . In order to deter companies and employers from *strategically withholding* the payment of arbitration fees, the company in breach is required to pay reasonable attorney's fees and costs and the court is required to impose sanctions." (Sen. Rules Com. Analysis, *supra,* at p. 4, italics added.) Similarly, the Assembly Committee on Judiciary observed: "The sanctions provided in this bill are intended to deter *bad actors.*" (Assem. Com. on Judiciary Analysis, *supra,* at p. 8, boldface and some italics omitted.) Nothing in the legislative history suggests that the Legislature intended to penalize inadvertent or excusable delay, to ignore the relevance of the breaching party's conduct as in *Brown* and *Sink,* or to

displace avenues for relief from forfeiture that have long been available in law and equity. (See *In re Greg F., supra*, 55 Cal.4th at pp. 408–409 [finding "nothing [in legislative history] to suggest that the Legislature intended to deprive juvenile courts of their long-standing discretion to dismiss delinquency petitions when appropriate" despite unambiguously mandatory language of Welf. & Inst. Code, § 733, subd. (c)].)

The court in *Espinoza* observed that along with the provisions requiring timely payment, the Legislature in Senate Bill 707 enacted a sanctions provision that distinguishes between mandatory and discretionary sanctions. (*Espinoza, supra*, 83 Cal.App.5th at p. 776; compare § 1281.99, subd. (a) ["The court shall . . . order[] the drafting party to pay the reasonable expenses, including attorney's fees and costs, incurred by the employee or consumer as a result of the material breach."] with *id.*, subd. (b) [the court "may order" evidence sanctions or terminating sanctions "unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust"].) "Given the Legislature's express grant of discretion as to imposition of nonmonetary sanctions," *Espinoza* reasoned, "we may presume the Legislature did not intend implicitly to grant that same discretion on the issues of material breach and imposition of monetary sanctions." (*Espinoza*, at p. 776.) But this argument does not contend with the background statutes and principles discussed above that provide for relief in certain instances of nonperformance. If the Legislature did not intend to limit the operation of that background law — and we see no indication that it did — there would have been no need for it to explicitly "grant [the] same discretion on the issues of material breach." (*Ibid.*)

Our dissenting colleague notes that the language of section 1281.99 "presumes that a finding of material breach will result from a delinquent payment *even when the defaulting party acted with substantial justification*" and finds this "difficult to square" with our construction of section 1281.98. (Dis. opn., *post*, at p. 11.) We see no such tension. Consistent with general contract law, a material breach is enough to trigger an award of compensatory damages, which the mandatory sanctions provision of section 1281.99, subdivision (a) provides for. But other consequences depend on the circumstances: the background statutes discussed above can in some situations prevent a material breach from occasioning a loss of the defaulting party's right to arbitrate, just as "substantial justification" for delay can relieve a defaulting party from discretionary sanctions under section 1281.99, subdivision (b).

The *Espinoza* court also said the Assembly Committee on Judiciary's analysis of Senate Bill 707 "indicates the Legislature considered and rejected the argument that [the payment provisions] would unfairly penalize drafting parties for minor errors." (*Espinoza, supra*, 83 Cal.App.5th at p. 777; see dis. opn., *post*, at pp. 9–10.) The committee analysis acknowledged a concern raised by opponents of the bill that "provisions may impose sanctions even if[] 'the drafting party paid a majority of the fees and costs, but yet a small, minor portion was not paid.'" (Assem. Com. on Judiciary Analysis, *supra*, at p. 8.) That may be true, the committee responded, but the "risk" that the statute could subject the drafting party to sanctions for a "relative[ly] small non-payment of arbitration fees or costs" should "be viewed in light of the harm that the drafting party's breach of contract could impose on employees or consumers who are in limbo." (*Ibid.*) "[T]he ensuing delay associated with this minor

27

error could be significant to the employee, who may not be able to pay bills, rent or other expenses that could result in the loss of their residence, or damage to their credit rating, while the dispute remains unresolved." (*Id.* at pp. 8–9.) "In light of the extreme hardship that needlessly delaying arbitration may cause to plaintiffs, the material breach and sanction provisions of this bill would seem to be a strict yet reasonable method to ensure the timely adjudication of employee and consumer claims that are subject to arbitration." (*Id.* at p. 9.)

Although this passage of the committee analysis makes reference to "the material breach and sanction provisions" (see dis. opn., *post*, at p. 10, fn. 4), it primarily responds to the opponents' concern that a "minor error" may result in "sanctions" (Assem. Com. on Judiciary Analysis, *supra*, at p. 8). The committee explained that an error, though "minor" or "immaterial" to the drafting party, "could be significant to the employee, who may not be able to pay bills, rent or other expenses that could result in the loss of their residence, or damage to their credit rating, while the dispute remains unresolved." (*Id.* at pp. 8–9.) This response supplies a justification for section 1281.99's mandatory sanction provision, which requires the drafting party to pay any reasonable expenses incurred by the employee or consumer as a result of its failure to timely pay arbitration fees (§ 1281.99, subd. (a)) — in essence, to make the other party whole (Civ. Code, § 3275) — whether the nonpayment was willful or not.

But the cited passage does not address whether the drafting party may be excused from loss of arbitral rights in the event of a "minor error" that is unintentional, inadvertent, or otherwise excusable. Indeed, the passage appears in a section titled "***The sanctions provided in this bill are intended to***

***deter bad actors.***" (Assem. Com. on Judiciary Analysis, *supra*, at p. 8.) To illustrate the concerns that the committee had in mind, the passage cites the case of Chipotle's " 'unseemly' " conduct in "attempt[ing] to delay and obfuscate the adjudication of claims" in arbitration, as well as the drafting party's "refus[al] to pay the arbitrator" "in the *Dillard's* case." (*Id.* at p. 9.) These examples cohere with the Legislature's declaration in the statute that "[a] company's *strategic* non-payment of fees and costs severely prejudices the ability of employees or consumers to vindicate their rights." (Stats. 2019, ch. 870, § 1, subd. (d), italics added.) We find no indication that the Legislature, in enacting a "strict yet reasonable method" to ensure timely payment of arbitration fees (Assem. Com. on Judiciary Analysis, *supra*, at p. 9), intended that *any* instance of nonpayment by the drafting party, regardless of the circumstances, would result in loss of its right to arbitration. It is "reasonable to infer that the Legislature intended no such anomaly, and that it intended, rather, a coherent and harmonious system of [contract] laws." (*Coachella Valley*, *supra*, 35 Cal.4th at p. 1090.)

Our dissenting colleague cites letters from opponents of Senate Bill 707 complaining that the bill would penalize unintentional or minor defaults, and observes that "no response was given to assure opponents that the new law would apply only to willful or strategic nonpayment" and that the text and "legislative history of Senate Bill 707 say[] *nothing at all* about making an exception for unintentional or trivial delinquencies." (Dis. opn., *post*, at p. 9.) But "that construction reads too much into legislative silence." (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1079; see *People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 243 ["inferences from legislative inaction are necessarily speculative"].) As noted, we

presume the Legislature is aware of existing laws and intends to enact new law in harmony with background laws absent a "definitive indication" to the contrary. (*In re Friend, supra*, 11 Cal.5th at p. 734.) On that presumption, the Legislature had no need to respond or to enact exceptions to address those concerns.

None of this is to say that the strict reading of the payment provisions adopted by *Espinoza* and other courts is an implausible construction. (See *Espinoza, supra*, 83 Cal.App.5th at p. 777 ["Although strict application may in some cases impose costs on drafting parties for innocent mistakes, the Legislature could have concluded a bright-line rule is preferable to requiring the nondrafting party to incur further delay and expense establishing the nonpayment was intentional and prejudicial."].) But because that reading would raise preemption concerns, as discussed below, we "should, if reasonably possible, construe [the] statute 'in a manner that avoids *any* doubt about its [constitutional] validity.' " (*Kleffman, supra*, 49 Cal.4th at p. 346.) Here it is not just "reasonably possible" (*ibid.*) to construe section 1281.98 in harmony with background statutes and principles that allow relief from forfeiture where nonperformance is not willful, fraudulent, or grossly negligent. That construction is amply supported by the Legislature's own declaration of purpose in the statute and legislative history.

## IV.

We now consider whether section 1281.98 is preempted by the FAA.

## A.

As noted, section 2 of the FAA provides that a written arbitration agreement is "valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." (9 U.S.C. § 2.) This provision establishes " 'an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" . . . but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." ' " (*Viking River*, *supra*, 596 U.S. at p. 650.)

As an initial matter, Hohenshelt contends that the equal-treatment inquiry is not triggered in this case because section 1281.98 does not revoke, invalidate, or make unenforceable any arbitration agreement. He notes that section 1281.98 comes into play only after an arbitration agreement has been enforced and an arbitration is underway, and that the drafting party's failure to make timely payments does not end the arbitration but rather gives the other party the option of continuing the arbitration or proceeding to court. In response, Golden State argues that section 1281.98 "clearly 'affect[s] the enforceability of the arbitration agreement itself,' as it deprive[s] [the drafting party] of the right to enforce the agreement altogether." According to Golden State, "giving one party the 'option' to withdraw from the arbitration impairs the other party's right to enforce their agreement to arbitrate by definition." (See *Belyea*, *supra*, 637 F.Supp.3d at p. 758 ["A rule affects the 'enforceability' of a contract when it determines that one side may enforce the contract, but the other may not."].)

The FAA "does not define" revocability, invalidity, or enforceability (*Concepcion*, *supra*, 563 U.S. at p. 354 (conc. opn. of Thomas, J.)), and we need not do so here. Assuming that section 1281.98 renders the arbitration agreement unenforceable within the meaning of the FAA by authorizing

Hohenshelt to withdraw from arbitration and proceed in court in light of Golden State's failure to timely pay arbitration fees, we conclude that the payment rules do not offend the equal-treatment principle.

Golden State argues that section 1281.98 discriminates against arbitration agreements as compared to other contracts in three respects:  It makes payment "due upon receipt" of the arbitrator's invoice (§ 1281.98, subd. (a)(2)), whereas the general rule for service contracts is that payment is not due until services are performed.  It defines failure to make timely payment as "material breach of the arbitration agreement" (*id.*, subd. (a)(1)), whereas material breach is generally a factual question resolved on a case-by-case basis.  And it renders the arbitration agreement unenforceable by the drafting party even in cases of inconsequential delay (*id.*, subd. (b)), whereas short delays in performance do not typically result in the loss of important contractual rights in other contexts.  (See *Hernandez, supra*, 102 Cal.App.5th at pp. 243–244; *Belyea, supra*, 637 F.Supp.3d at pp. 757–758.)

To begin, we note that section 1281.98 does not mandate that arbitration fees invariably be paid within 30 days of the arbitrator's invoice regardless of the parties' preferences.  (Cf. dis. opn., *post*, at p. 13 [doubting that "a statute may amend arbitration contracts by inserting a material term to which the parties did not agree"].)  The statute provides a default rule that invoices are "due upon receipt" and must be "paid within 30 days."  (§ 1281.98, subd. (a)(1), (2).)  But parties are free to contract for any due date they want by adopting their own "provision in the arbitration agreement stating the number of days in which the parties to the arbitration must pay any required fees or costs."  (*Id.*, subd. (a)(2).)  Even after a dispute

has arisen, they may mutually agree to "[a]ny extension of time for the due date" (*ibid.*); indeed, nothing in the statute appears to prohibit parties from agreeing on an extension even within the 30-day period after a due date has passed. Under the statute, parties retain flexibility to establish and revise their own payment agreements to be " 'enforced according to their terms.' " (*Concepcion*, *supra*, 563 U.S. at p. 344.)

Moreover, section 1281.98's default timeline is consistent with the FAA's policy of "increasing the speed of dispute resolution." (*Concepcion*, *supra*, 563 U.S. at p. 345.) A 30-day payment deadline after issuance of the arbitrator's invoice tracks other situations where contextual clues suggest that parties want time to be of the essence. (See, e.g., *Champion Gold Mining Co. v. Champion Mines* (1912) 164 Cal. 205, 213 ["where mines or mining properties are the subject of contract, time is of the essence, independent of any express stipulation inserted in the instrument"]; *Hendren v. Yonash* (1966) 243 Cal.App.2d 672, 679 ["The fact that the words 'time is of the essence' are not in the contract is not important . . . . Generally, time is of the essence in an option without specification in the contract."]; 2 Corbin on Contracts (2024) § 78.03; see also *Centurion Air Cargo, Inc. v. United Parcel Service Co.* (11th Cir. 2005) 420 F.3d 1146, 1151 ["Time is of the essence under Florida law when (1) the agreement explicitly so specifies; or (2) such may be determined from the subject matter of the contract; or (3) treating time as non-essential would produce a hardship; or (4) notice has been given to the defaulting party requesting performance within a reasonable time."].)

Our dissenting colleague asserts that unlike other situations in which courts have presumed that time is of the

essence, late payment of arbitration fees "does not cause inestimable harm or defeat the very purpose of the contract." (Dis. opn., *post*, at p. 14.)  But our Legislature has concluded that late payment and the resulting delay in vindicating plaintiffs' rights can cause nonpecuniary harm in the form of "extreme hardship" due to loss of "livelihood."  (Assem. Com. on Judiciary Analysis, *supra*, at pp. 8–9.)  And as explained above, the Legislature enacted the payment provisions because failure to timely pay fees does "defeat the very purpose of the [arbitration] contract."  (Dis. opn., *post*, at p. 14; see *ante*, at pp. 11–12, 24–25.)

Next, Golden State contends that outside of section 1281.98, the question of whether a party has materially breached or substantially performed its contractual obligations is subject to case-by-case factual determination.  (See *Belyea*, *supra*, 637 F.Supp.3d at p. 757.)  This feature of section 1281.98, Golden State contends, uniquely penalizes trivial delays in performance.  We agree that if section 1281.98 were construed to mean that any failure to make timely payment, regardless of the circumstances, invariably results in forfeiture of arbitral rights, the statute would be anomalous in the context of general contract law principles.  As we have explained, however, a drafting party can avoid forfeiture of its right to arbitration by showing that the delay was excusable under section 473, Civil Code section 3275, or Civil Code section 1511, the background principles that generally apply to other contractual obligations.

And while it is true that whether a party has substantially performed is generally a fact-specific question, we have long held that good faith is a necessary condition to a finding of substantial performance.  (See *Perry v. Quackenbush* (1894) 105 Cal. 299, 308 [" 'The party must have intended in good faith to

34

comply with the terms of the contract. . . . [A] voluntary abandonment of the agreement, or a willful departure from its stipulations, are not allowed.' "]; *Connell v. Higgins* (1915) 170 Cal. 541, 556 ["Substantial performance means that there has been no willful departure from the terms of the contract, and no omission of any of its essential parts, and that the contractor has in good faith performed all of its substantive terms."]; see also CACI No. 312 ["[t]o overcome" a finding of material breach that excuses the nonbreaching party's performance under the contract, the breaching party must "prove" that it "made a good faith effort to comply with the contract"].)

Accordingly, under general contract law principles as under section 1281.98, a drafting party cannot avoid discharging the other party's contractual duty to proceed in arbitration if it willfully withholds fees necessary to move arbitration forward. Conversely, if the drafting party acted in good faith, it may seek relief under the above statutes, and its claim should be evaluated under the usual principles in law and equity governing relief from forfeiture or default, including whether the other party has been prejudiced. (See, e.g., *Magic Carpet*, *supra*, 41 Cal.App.5th at p. 365 [discussing five factors bearing on such relief: "(1) 'the extent to which the injured party will be deprived of the benefit which he reasonably expected'; (2) 'the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived'; (3) 'the extent to which the party failing to perform or to offer to perform will suffer forfeiture'; (4) 'the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances'; and (5) 'the extent to which the behavior

of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing' "].)

Our dissenting colleague cites *MacFadden v. Walker* (1971) 5 Cal.3d 809, 814, for the proposition that "California common law has long recognized a defense *even for willful delinquencies*, so long as the other contracting party has suffered no significant prejudice related to the default." (Dis. opn., *post*, at pp. 15–16.) But "[t]he reasoning of the *MacFadden* decision is grounded in the fact that the court was enforcing what is commonly referred to as a 'land sale contract' which, typically, is a transaction wherein the buyer takes possession of the property and promises to pay the consideration by installments, but the seller withholds delivery of the deed until a substantial part or all of the payments have been received." (*Nash v. Superior Court* (1978) 86 Cal.App.3d 690, 697.) "The *MacFadden* opinion acknowledges that this kind of land sale contract is functionally similar to a security device, such as a mortgage; and that the law gives a wilfully defaulting mortgagor an opportunity to cure his default." (*Ibid.*)

Neither this court nor any Court of Appeal has ever applied *MacFadden* to excuse a willful breach from occasioning forfeiture outside of contracts involving real property. *Peterson v. Hartell* (1985) 40 Cal.3d 102, 106, which "reaffirmed *MacFadden*" (dis. opn., *post*, at p. 17), likewise involved an installment land sale contract. Outside of that context, *MacFadden* and *Peterson* did not purport to displace the longstanding common law rule, codified in Civil Code section 3275, that a breaching party will not be relieved from forfeiture where the breach was grossly negligent, willful, or fraudulent. Although *Magic Carpet*, *supra*, 41 Cal.App.5th 357 and *Saika v. Gold* (1996) 49 Cal.App.4th 1074 cited *MacFadden* in disputes

not involving real property (see dis. opn., *post*, at pp. 17–18 & fn. 8), neither involved a willful breach of an otherwise enforceable agreement. (See *Magic Carpet*, at p. 364 ["The evidence . . . shows that Rugger had not willfully departed from the terms of the contract but diligently sought to obtain a lien release from Cutter."]; *Saika v. Gold*, at p. 1082 [refusing to enforce an illusory promise].)

Nor does *Harriman v. Tetik* (1961) 56 Cal.2d 805, which involved a claim for restitution under a theory of unjust enrichment, support a contrary view. (Dis. opn., *post*, at p. 17.) *Harriman* held that "in a variety of situations," even a willfully breaching party can recover any excess retained by the other party beyond the actual harm caused by the breach. (*Harriman*, at p. 811; see *Freedman v. The Rector* (1951) 37 Cal.2d 16, 19–20.) Such a situation can arise when the nonbreaching party keeps a deposit or other consideration paid by the other party in anticipation of further contractual performance. (See *Harriman*, at p. 812 [escrow]; *Freedman*, at p. 19 [downpayment]; *Magic Carpet*, *supra*, 41 Cal.App.5th at p. 362 [escrow].) It is not clear how a consumer or employee could be unjustly enriched when a drafting party delays an arbitration under the CAA's payment provisions. But if such a situation were to arise, the statute does not foreclose restitution as an ordinary contractual remedy. In any event, the principle embodied in *Harriman* and *Freedman* is that an injured party is entitled to "an award for 'losses caused and gains prevented by the defendant's breach, in excess of savings made possible,'" and no more. (2 Corbin on Contracts, *supra*, § 55.05; accord, Rest.2d Contracts, § 347.) By ordering breaching parties to pay no more than "the reasonable expenses . . . incurred by the

employee or consumer as a result of the material breach" (§ 1281.99, subd. (a)), the CAA is in accord.

To be sure, at the time Senate Bill 707 was enacted, California and federal courts maintained a special rule requiring a party asserting waiver of arbitration to show prejudice, even in cases of willful delay. (See *Brown*, *supra*, 430 F.3d at p. 1012; *Quach*, *supra*, 16 Cal.5th at pp. 569, 573–574.) But as we recently held, consistent with the high court's decision in *Morgan*, *supra*, 596 U.S. 411, 418, the unique prejudice requirement for arbitral waivers cannot be squared with the FAA's equal-treatment principle. (*Quach*, at pp. 569, 578; see *id.* at p. 585 ["The waiver inquiry is exclusively focused on the waiving party's words or conduct; neither the effect of that conduct on the party seeking to avoid enforcement of the contractual right nor that party's subjective evaluation of the waiving party's intent is relevant."].)

In sum, instead of "[i]mposing a higher standard for enforcement of arbitration agreements" (*Hernandez*, *supra*, 102 Cal.App.5th at p. 244), section 1281.98, construed in harmony with background statutes, makes arbitration contracts enforceable on the same grounds as those that apply to other contracts: When a party breaches its contractual obligations willfully, fraudulently, or with gross negligence, it cannot escape the consequences by pointing to a lack of harm to the other party. But short of such wrongful conduct, a breaching party may be relieved from forfeiting its right to enforce an arbitration agreement based on the circumstances, as provided by longstanding legal principles.

**B.**

Golden State further contends that section 1281.98 is preempted because it "interfere[s] with the fundamental aspects of arbitration" by stripping arbitrators of control of their own financial affairs, by eliminating individualized determinations of waiver and breach, by imposing procedural rigor stricter than judicial proceedings, and by upsetting the fundamental expectation that parties will have no contact with the court after agreeing to arbitrate.

In *Concepcion*, the high court described "fundamental attributes of arbitration" in terms of the parties' "discretion in designing arbitration processes" and "the informality of arbitral proceedings," which are "desirable" because they "allow for efficient, streamlined procedures tailored to the type of dispute" and "reduc[e] the cost and increas[e] the speed of dispute resolution." (*Concepcion*, *supra*, 563 U.S. at pp. 344–345.) *Concepcion* invalidated a state-law rule against class waivers as applied to arbitration agreements, explaining that class arbitration "*requires* procedural formality" (*id.* at p. 349) and "makes the process slower, more costly, and more likely to generate procedural morass than final judgment" (*id.* at p. 348). The high court emphasized that " '[a] prime objective of an agreement to arbitrate is to achieve "streamlined proceedings and expeditious results." ' " (*Id.* at p. 346, quoting *Preston v. Ferrer* (2008) 552 U.S. 346, 357 (*Preston*).)

Whereas rules barring waiver of class arbitration or requiring administrative exhaustion have been held to interfere with fundamental attributes of arbitration (see *Concepcion*, *supra*, 563 U.S. at pp. 348–349; *Preston*, *supra*, 552 U.S. at p. 359), Golden State's concerns about section 1281.98 are far

afield.  No authority suggests that an arbitrator's control over payment deadlines is a fundamental attribute of arbitration. What is a fundamental attribute is "affording *parties* discretion in designing arbitration processes" (*Concepcion*, at p. 344, italics added), and section 1281.98 preserves that discretion by setting a default rule for timely payment that parties can override (*ante*, at pp. 1, 13).  We are also unpersuaded that section 1281.98 imposes on arbitration a degree of procedural rigor that exceeds what occurs in court.  For this proposition, Golden State cites *Lamps Plus, Inc. v. Varela* (2019) 587 U.S. 176, but the high court's discussion in that case focused on the " 'procedural rigor' " entailed by class arbitration and how its " 'risks and costs' " threatened to undermine arbitration's virtues of " 'speed and simplicity and inexpensiveness' " (*id.* at pp. 184–185). Unlike a rule against class arbitration waivers, section 1281.98 presents no risk of "generat[ing] procedural morass" (*Concepcion*, *supra*, 563 U.S. at p. 348); instead, it simplifies payment procedures with a clearer rule.

As for Golden State's contention that section 1281.98 improperly returns the parties to court after agreeing to arbitrate, the FAA itself "envisions" a "supervisory role . . . for the courts" as arbitration proceeds.  (*Smith v. Spizzirri* (2024) 601 U.S. 472, 478.)  Section 3 of the FAA provides that when a federal court has determined that a claim is referable to arbitration under an arbitration agreement, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." (9 U.S.C. § 3.)  The high court in *Smith* explained that this statute, by authorizing a stay and not dismissal of the action, "ensures that the parties

can return to federal court if arbitration breaks down or fails to resolve the dispute," including in circumstances where " 'the applicant for the stay is . . . in default in proceeding with such arbitration.' " (*Smith*, at pp. 476–477.) By offering a "return ticket" to court (*id.* at p. 477) when the drafting party has defaulted on its obligation to timely pay the arbitrator, section 1281.98 does not conflict with the policy of the FAA.

## C.

Finally, Golden State says the operation of section 1281.98 is "more likely to delay resolution of disputes than expedite it." According to Golden State, "[t]his case perfectly illustrates how sections 1281.97 *et seq.* can result in substantial delay. Golden State Foods and Hohenshelt arbitrated for over a year. In a world without section 1281.98, the parties would have proceeded in arbitration pursuant to the agreed-upon scheduling order, and this case would have been resolved nearly two years ago." (See *Hernandez, supra*, 102 Cal.App.5th at p. 244 [CAA's payment rules "increas[e] the overall cost of litigation and wast[e] resources already invested toward arbitration"].)

To be sure, where the drafting party has refused to make timely payment during an arbitration already underway, a decision by the other party to withdraw from arbitration and proceed in court may add time and costs to the dispute's resolution. But what about the mine-run of cases where the drafting party timely pays required fees or makes a good-faith effort to do so? (See *Hernandez, supra*, 102 Cal.App.5th at p. 248, fn. 3 (dis. opn. of Baker, Acting P. J.) ["[W]hether [the payment rule] is an obstacle to accomplishment of the Federal Arbitration Act's purposes must be considered at scale, meaning in the great many cases the statute was enacted to govern, not

a select few. To draw an analogy, one does not decide whether strict notice of appeal timeliness rules enable prompt adjudication of challenges to trial court rulings by considering only those appeals that are dismissed because the notice of appeal was not timely filed."].) Although Golden State says this case would have been resolved two years ago "[i]n a world without section 1281.98," that is also true in a world in which Golden State had complied with section 1281.98. We have no reason to doubt that most companies will make good-faith efforts to comply with the payment deadline or write agreements with an alternative payment schedule that likewise promotes certainty and ensures that arbitration goes forward. (See *Hernandez, supra*, 102 Cal.App.5th at p. 248, fn. 4 (dis. opn. of Baker, Acting P. J.) ["Even if a few matters are removed from arbitration in a case of a minor or inadvertent delay, it is still [the] case that [the statute] overall ensures arbitrations proceed more quickly."].)

Without a rule requiring timely payment of arbitration fees and imposing meaningful consequences for willful nonpayment, companies could continue to stymie dispute resolution "by refusing to participate in the arbitration proceedings" initiated by their consumers or employees. (*Brown, supra*, 430 F.3d at p. 1010.) The Legislature enacted section 1281.98 to deter strategic nonpayment and thereby remedy a "concerning and troubling trend" of delay. (Sen. Com. on Judiciary Analysis, *supra*, at p. 6.) The FAA does not foreclose this approach to "increasing the speed of dispute resolution" and ensuring "efficient, streamlined procedures tailored to the type of dispute." (*Concepcion, supra*, 563 U.S. at pp. 344–345.) Indeed, it would be ironic if the FAA's policy of enforcing agreements to arbitrate effectively cannibalized a

state law that aims to keep parties to such agreements moving forward in arbitration by requiring timely payment of arbitration fees.

## CONCLUSION

We agree with the Court of Appeal that section 1281.98 is not preempted by the FAA. But in light of our clarification that section 1281.98 does not displace background statutes permitting relief to a breaching party in certain circumstances, we reverse the Court of Appeal's order "direct[ing] the trial court to vacate its order denying the motion to lift the stay of litigation and to enter an order lifting the stay." (*Hohenshelt, supra*, 99 Cal.App.5th at p. 1326.) We direct the Court of Appeal to remand the matter to the trial court for consideration of whether Golden State may be excused for its failure to timely pay arbitration fees, such that the stay of litigation should not be lifted and the parties should be returned to arbitration, and whether the delay resulted in compensable harm to Hohenshelt.

We disapprove *Gallo v. Wood Ranch USA, Inc., supra*, 81 Cal.App.5th 621, *Espinoza v. Superior Court, supra*, 83 Cal.App.5th 761, *De Leon v. Juanita's Foods*, *supra*, 85 Cal.App.5th 740, *Williams v. West Coast Hospitals, Inc.*, *supra*, 86 Cal.App.5th 1054, *Doe v. Superior Court, supra*, 95 Cal.App.5th 346, *Suarez v. Superior Court, supra*, 99 Cal.App.5th 32, *Hernandez v. Sohnen Enterprises, Inc., supra*, 102 Cal.App.5th 222, *Keeton v. Tesla, Inc., supra*, 103 Cal.App.5th 26, *Trujillo v. J-M Manufacturing Co., Inc.* (2024) 107 Cal.App.5th 56, *Colon-Perez v. Security Industry Specialists, Inc., supra*, 108 Cal.App.5th 403, and *Sanders v. Superior Court* (2025) 110 Cal.App.5th 1304, to the extent they are inconsistent with this opinion.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

HOHENSHELT v. SUPERIOR COURT

S284498


Concurring Opinion by Justice Groban


I write separately to highlight a significant question that the majority opinion sensibly leaves open. As the majority opinion notes, Golden State Foods Corporation (Golden State) argues in its briefing before us that the parties agreed that their disputes would be governed by the Federal Arbitration Act's (FAA; 9 U.S.C. § 1 et seq.) procedural rules and the rules of whichever private arbitrator they selected. (Maj. opn., *ante*, at pp. 7–8.) Golden State contends that for this reason, the California Arbitration Act's (CAA; Code Civ. Proc., § 1280 et seq.) rules — including Code of Civil Procedure section 1281.98 (section 1281.98) — therefore do not govern this dispute. I concur in the majority opinion's conclusion that Golden State waived this argument by not raising it below. (Maj. opn., *ante*, at p. 7.) Given this waiver, it makes sense not to address questions related to the interpretation of the arbitration agreement and, instead, to focus our analysis on the interpretation of section 1281.98. I also concur in the majority opinion's conclusion that section 1281.98, properly interpreted, is not preempted under the FAA's equal treatment principle or otherwise. (Maj. opn., *ante*, at pp. 1–2.)

However, because the majority opinion focuses on Golden State's arguments concerning section 1281.98 and the equal treatment principle, it does not address an analytically prior question, the answer to which will often be dispositive of FAA

preemption challenges: Did the parties agree that the CAA's procedural rules would govern their disputes?

As the United States Supreme Court has emphasized, the FAA's "primary purpose" is to ensure that courts enforce arbitration agreements "according to their terms." (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 479 (*Volt*).) The FAA contemplates that states will enact their own rules governing arbitration proceedings in state courts. (*Volt*, at pp. 474–475.)[1] When the parties to an arbitration agreement have agreed that state procedural rules will govern their disputes, applying those rules furthers the overarching federal policy of "ensur[ing] the enforceability, according to their terms, of private agreements to arbitrate." (*Id.* at p. 476.)

In *Volt*, the United States Supreme Court addressed a FAA preemption challenge to a CAA provision — Code of Civil Procedure section 1281.2, subdivision (c) — that allows courts to deny a motion to compel arbitration or to stay arbitration pending resolution of related litigation. (*Volt*, *supra*, 489 U.S. at p. 471.) Upholding the provision, the court observed: "There is no federal policy favoring arbitration under a certain set of procedural rules." (*Id.* at p. 476.) The court reasoned that since

_____

[1] As the Court of Appeal has observed, "[t]hose state laws will, by definition, be arbitration specific. If such state laws were preempted merely because they singled out arbitration for differential treatment, states would never be able to enact rules defining the procedures for arbitration unless the procedures mirrored those for every other case handled in a judicial forum (as that would render them no longer 'arbitration specific'), yet requiring such parity would utterly defeat the very purpose of arbitration in the first place — namely, to create an alternative, more 'efficient and speedy dispute resolution' mechanism." (*Gallo v. Wood Ranch USA, Inc.* (2022) 81 Cal.App.5th 621, 639.)

the arbitration agreement at issue incorporated the CAA's procedural rules, the stay provision would only be preempted if applying it "in accordance with the terms of the arbitration agreement itself, would undermine the goals and policies of the FAA." (*Id.* at pp. 477–478.)  The court concluded: "Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." (*Id.* at p. 479.)  Thus, when the parties to an arbitration agreement have agreed that state procedural rules will govern the adjudication of their disputes, a court's application of those rules to their disputes is not preempted. (*Id.* at pp. 477–479.)

In many, if not most, cases, it will be readily apparent whether the parties agreed that the CAA's procedural rules would govern their disputes.  By contrast to federal preemption, the interpretation of contracts is a matter of state law. (*Volt, supra,* 489 U.S. at p. 474.)  It has long been the rule in California that "the CAA's procedural rules apply by default to cases brought in California courts, including those in which the FAA governs the arbitrability of the controversy." (*Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 582; see *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 409.)[2]  We assume that California arbitration

---

[2]    The FAA's procedural provisions do not, by their terms, apply in state court. (See 9 U.S.C. §§ 3 [referring to proceedings "brought in any of the courts of the United States"], 4 [referring to "any United States district court"]; *Volt, supra,* 489 U.S. at p. 477, fn. 6; *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 389–390 (*Cronus Investments*).)

agreements are drafted with this rule in mind, and so that they incorporate the CAA's procedural rules absent an express indication to the contrary. (14A Cal.Jur.3d (2025) Contracts, § 241 ["Parties are presumed to have had existing law in mind when they executed their contractual agreement, and 'existing law' includes decisions of appellate courts interpreting statutes"]; see *Cronus Investments*, *supra*, 35 Cal.4th at p. 394 [For the FAA's procedural rules to apply, "parties to an arbitration agreement" must "expressly designate that any arbitration proceeding should move forward under the FAA's procedural provisions rather than under state procedural law"].) Accordingly, there is no obvious reason to treat an agreement to which the CAA's procedural rules apply by default differently from one that expressly states that the CAA's procedural rules apply. (See *Espinoza v. Superior Court* (2022) 83 Cal.App.5th 761, 785 [observing that the distinction between agreements that "expressly incorporate the CAA" and those that do not does not affect the preemption analysis because "the arbitration agreement . . . incorporates the CAA by default"].) Indeed, to require an express statement that the CAA's procedural rules apply would turn the default rule on its head, making it so that the CAA's procedural rules are, by default, inapplicable. Absent an express indication to the contrary, a California arbitration agreement generally should be interpreted as incorporating the CAA's procedural rules.

Where a court has interpreted an arbitration agreement as reflecting the parties' agreement that the CAA's procedural rules will apply to their disputes, the court need not then go on to consider any argument that applying those rules would violate the equal treatment principle. (See *Hernandez v. Sohnen Enterprises, Inc.* (2024) 102 Cal.App.5th 222, 240 ["[I]f the

4

parties have agreed to apply" a provision of the CAA, "no discussion of preemption is required"].) The equal treatment principle comes into play *only when state statutory or case law renders an arbitration agreement invalid, revocable, or unenforceable.* (See 9 U.S.C. § 2 [An arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"].) A state court decision that enforces an arbitration agreement in accordance with its terms has none of these effects. Even when applying state procedural law "in accordance with the terms of the arbitration agreement itself" results in a dispute returning to court that otherwise would be subject to arbitration, its application does not "undermine the goals and policies of the FAA." (*Volt, supra*, 489 U.S. at pp. 477, 478.)

I agree with the majority's determination that, in the circumstances of this case, it makes sense to address the argument that section 1281.98 is preempted under the FAA's equal treatment principle. But in many cases, a California court will not need to engage in this analysis. When an arbitration agreement incorporates the CAA's procedural rules, the CAA will apply, and no federal preemption concerns arise.

**GROBAN, J.**


**I Concur:**

**EVANS, J.**

HOHENSHELT v. SUPERIOR COURT

S284498


Dissenting Opinion by Justice Corrigan


I disagree that Code of Civil Procedure section 1281.98[1] can be saved from preemption, as the majority suggests, because significant differences remain in the statute's treatment of employment and consumer arbitration contracts as compared to other binding agreements negotiated between the parties. Even with the ameliorative measures provided by the majority's modifications, section 1281.98 still fails "to place arbitration agreements 'on equal footing with all other contracts'" under California law. (*Kindred Nursing Centers L.P. v. Clark* (2017) 581 U.S. 246, 248 (*Kindred*).) As a result, I would hold it is preempted by the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.).

**I.**

The relevant provisions of section 1281.98 state: "(a) (1) In an employment or consumer arbitration that requires, either expressly or through application of state or federal law or the rules of the arbitration provider, that the drafting party pay certain fees and costs during the pendency of an arbitration proceeding, *if the fees or costs required to continue the arbitration proceeding are not paid within 30 days after the due date, the drafting party is in material breach of the arbitration*

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

1

*agreement, is in default of the arbitration, and waives its right to compel the employee or consumer to proceed with that arbitration as a result of the material breach.* [¶] (2) . . . [A]bsent an express provision in the arbitration agreement stating the number of days in which the parties to the arbitration must pay any required fees or costs, the arbitration provider shall issue all invoices to the parties as *due upon receipt. Any extension of time for the due date shall be agreed upon by all parties. . . .* [¶] (b) *If the drafting party materially breaches the arbitration agreement and is in default under subdivision (a), the employee or consumer may unilaterally elect to do any of the following:* [¶] *(1) Withdraw the claim from arbitration and proceed in a court of appropriate jurisdiction.*" (Italics added.) If the employee or consumer chooses instead to continue with arbitration (§ 1281.98, subd. (b)(2)), the payment of delinquent fees may be compelled by the court (*id.*, subd. (b)(3)), reimbursed to the employee or consumer as part of the arbitration award (*id.*, subd. (b)(4)), or collected by the arbitration provider in a separate action (*id.*, subd. (b)(2)).

The statute also subjects the delinquent party to *mandatory* sanctions in the resulting court or arbitral proceeding. (§§ 1281.98, subds. (c)–(d), 1281.99.) Court-ordered sanctions must cover "the reasonable expenses, including attorney's fees and costs, incurred by the employee or consumer as a result of the material breach" (§ 1281.99, subd. (a)) and may also include evidentiary or terminating sanctions "unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust" (*id.*, subd. (b)).

These terms impose substantial strictures. First, the statute establishes a default rule that arbitration providers

2

make invoices for fees and costs due upon receipt. (§ 1281.98, subd. (a)(2).) Then, if an invoice is not paid within 30 days, the statute declares *as a matter of law* that the drafting party is "in material breach of the arbitration agreement," "in default of the arbitration," and has "waive[d] its right to compel the employee or consumer to proceed with that arbitration." (*Id*., subd. (a)(1).) Although contracting parties may agree to make arbitration invoices due at another time than "upon receipt" (*id*., subd. (a)(2)), the statute allows no alternative to its 30-day grace period. Nor can parties contract around the statute's requirement that "all parties" (*ibid*.) must agree to any extensions of time. Thus, even if the arbitration provider agrees to accept payment 45, or 35, or even 31 days after an invoice is due, a material breach of the arbitration agreement will result if the nonpaying party does not agree to an extension.[2] As a remedy for this statutorily declared breach, section 1281.98 allows employees and consumers to unilaterally withdraw from arbitration and proceed with their claims in court. (*Id*., subd. (b)(1).)

In short, the statute prescribes strict rules requiring early payment of arbitration-related costs and makes no allowances for delinquency of any kind, under any circumstances. The text of section 1281.98 permits "no exceptions . . . for substantial compliance or lack of prejudice." (*Hernandez v. Sohnen Enterprises, Inc.* (2024) 102 Cal.App.5th 222, 234 (*Hernandez*).)

---

[2] Due dates are even more strict under section 1281.97, the companion statute governing payments to initiate arbitration. Section 1281.97 requires that such payments be made within 30 days of the due date and makes no allowance for parties to agree otherwise. (Compare § 1281.97, subd. (a)(2) with § 1281.98, subd. (a)(2).)

Even if the delinquency was trivial, or due to an excusable oversight, and even if it caused no harm to the employee or consumer or any *actual* delay in the arbitration proceeding, section 1281.98 establishes that there was a material breach and waiver of the drafting party's right to arbitrate as a matter of law. With no need to show prejudice in any form to anyone, the other party can immediately withdraw from arbitration and move the dispute to court. A drafting party's contractual right to arbitrate may be imperiled multiple times over the course of a lengthy arbitration because section 1281.98's rules apply each time a payment is due. The question before us is whether these rules can be squared with the FAA.

The United States Supreme Court has repeatedly explained that section 2 of the FAA (9 U.S.C. § 2) "establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.' " (*Kindred, supra*, 581 U.S. at p. 251, quoting *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339 (*Concepcion*).) "[C]ourts must place arbitration agreements on an equal footing with other contracts [citation] and enforce them according to their terms [citation]." (*Concepcion,* at p. 339.) The equal treatment principle is central to FAA preemption law. In *Kindred*, for example, the high court held the FAA preempted a Kentucky rule requiring that arbitration agreements be executed only by principals or representatives expressly authorized to waive the principal's access to the courts. (*Kindred,* at p. 248.) Whatever benevolent intent may have motivated the Kentucky legislature to adopt the provision, the high court ruled it could not stand

because it "fail[ed] to put arbitration agreements on an equal plane with other contracts." (*Id*. at p. 252.)

Section 1281.98 likewise violates the equal treatment principle for two reasons that are plain from its text. First, by making payment of arbitration costs presumptively due "upon receipt" and by imposing a short grace period that parties cannot alter with different contract terms, section 1281.98 effectively converts all employment and consumer arbitration contracts into contracts that make time of the essence for paying arbitration fees. This requirement is contrary to the general rule that time is not of the essence in a contract unless the parties so agree. (See *Henck v. Lake Hemet Water Co.* (1937) 9 Cal.2d 136, 143 (*Henck*).) Second, section 1281.98 "mandates findings of material breach and waiver for late payment that do not apply generally to all contracts or even to all arbitrations." (*Hernandez*, *supra*, 102 Cal.App.5th at p. 243.) In other contexts, questions of waiver and breach of contract are fact specific. (See *Wild Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 78; *Boston LLC v. Juarez* (2016) 245 Cal.App.4th 75, 87; 23 Williston on Contracts (4th ed. 2024) § 63:15.)

Neither the parties nor the majority point to any other contracts that our law renders unenforceable on such stringent terms as those defined in section 1281.98. The statute makes contracts unenforceable on grounds that are specific to arbitration. (See *Belyea v. GreenSky, Inc.* (N.D.Cal. 2022) 637 F.Supp.3d 745, 756.) Because it singles out arbitration contracts for disfavored treatment, section 1281.98 is preempted by the FAA. (See *Kindred*, *supra*, 581 U.S. at p. 248.)

## II.

The majority opinion does not discuss the actual language of the statute in much detail. Instead, it begins its analysis by considering three statutory defenses to the forfeiture of contractual rights: section 473, subdivision (b), and Civil Code sections 3275 and 1511. (Maj. opn. *ante*, at pp. 16–20.) These statutes, the majority asserts, form a " 'legal backdrop' " against which the admittedly harsh terms of section 1281.98 must be "harmoniz[ed]." (Maj. opn. *ante*, at p. 20.) Finding no "clear indication that section 1281.98 was intended to limit the ordinary operation" of these statutory defenses (maj. opn. *ante*, at p. 21), the majority reasons that they remain available. Contrary to all Court of Appeal decisions that have examined section 1281.98, and to the plain language of the statute itself, the majority concludes the Legislature intended to punish only "*willful* nonpayment of fees." (Maj. opn. *ante*, at p. 24.)

The majority acknowledges that reading these statutory defenses into section 1281.98 is essential to save it from preemption. (See maj. opn. *ante*, at p. 30.) But the workaround doesn't quite work. There are three barriers to the majority's approach. The first problem is that harmonization is merely a tool to ascertain legislative intent, and the Legislature's clear intent was to deter *all* late payments and punish *all* transgressions, not merely those deemed willful. Neither the statutory language nor legislative history points to an intent to limit the harsh consequences of breach, default, and waiver to cases of willful violations. Moreover, even under the majority's interpretation, section 1281.98 still singles out arbitration agreements for disfavored treatment in two key ways. The majority's construction does not change the fact that section 1281.98 presumptively makes time to be "of the essence"

6

in all consumer and employment arbitration contracts and imposes timeliness rules the parties cannot contract around. (Maj. opn. *ante*, at p. 33.)  In addition, even accounting for the statutory defenses the majority grafts onto section 1281.98, drafting parties do not enjoy the benefit of the common law rule, applicable to all other contracts, that even willful breaches may be excused if they have resulted in no prejudice.  (See *MacFadden v. Walker* (1971) 5 Cal.3d 809, 814 (*MacFadden*).)

## A.

We have cautioned that "the principle of harmonization does not authorize courts to rewrite statutes." (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 175.) Harmonization is an appropriate tool when it allows a court to choose a plausible interpretation of one statute in order to avoid a conflict with a second statute.  (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956.)  "But the requirement that courts harmonize potentially inconsistent statutes when possible is not a license to redraft the statutes to strike a compromise that the Legislature did not reach."  (*Ibid*.; see *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 635 (*Michael G.*).)

The majority maintains its interpretation of section 1281.98 is consistent with legislative intent because the Legislature was concerned only about strategic, therefore willful, nonpayment of arbitration fees.  (See maj. opn. *ante*, at pp. 22–26.)  Certainly, the legislative history of Senate Bill No. 707 (2019–2020 Reg. Sess.) (Senate Bill 707) includes expressions of dismay about the willful behavior of "bad actors." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 707 (2019– 2020 Reg. Sess.) as amended May 20, 2019, p. 8, boldface and

italics omitted.) But the Legislature was put on notice that the bill's language swept more broadly and would encompass minor and unintentional defaults. Its response was not to clarify that such circumstances would not trigger the statute, but instead to rationalize that any hardship imposed on drafting parties was justified by the costs delay might cause employees and consumers.

Opponents raised concerns that under Senate Bill 707 even a trivial or unintentional delinquency would constitute a material breach and subject the drafting party to mandatory sanctions. Some observed that if a drafting party paid all but a small portion of fees and costs, that nominal amount would be deemed a " 'material breach,' thereby subjecting the employer or company to the same list of punishments as [one] who intentionally withheld the entire payment in an effort to delay the arbitration." (Jennifer Barrera, Cal. Chamber of Commerce, letter to Cal. State Assem., Jun. 20, 2019, p. 1; see William R. Manis, San Gabriel Valley Economic Partnership, letter to Assemblyman Mark Stone, Jun. 7, 2019, p. 2 (Manis letter).) Another concern was raised that a finding of material breach could be triggered even when a company withheld payment due to a valid, good faith dispute. (See Manis letter, at p. 2.)[3]

---

[3] One opponent also questioned who would decide whether a material breach had occurred: "Is it the arbitrator? Does the employee, consumer, or plaintiff's attorney simply get to make this determination unilaterally? Or is it a new action in civil court, resulting in more litigation, which the whole point of arbitration is to avoid?" (Manis letter, *supra*, at p. 2.) The question is not before us here, but the Courts of Appeal have held that courts must make this determination, even if the

Committee reports noted these issues (see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 707, *supra*, as amended May 20, 2019, p. 11; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 707 (2019–2020 Reg. Sess.) as amended May 20, 2019, p. 2), but no response was given to assure opponents that the new law would apply only to willful or strategic nonpayment.  On the contrary, just like the text of the statutes enacted, the legislative history of Senate Bill 707 says *nothing at all* about making an exception for unintentional or trivial delinquencies.

The Legislature did consider amending the bill to address "the scenario of a good-faith fee dispute" (Assem. Judiciary Com., Mandatory Information Worksheet on Sen. Bill No. 707 (2019–2020 Reg. Sess.) p. 4, italics omitted), but no specific language was ever proposed.  Similarly, an Assembly committee report acknowledged the opposition's concern about the bill's severe punishment for even a minor or mistaken failure to pay in full, but it reasoned that a bright-line rule was necessary to prevent harmful delays:  "Although a large company may view its failure to pay a few hundred dollars for arbitration as a minor, immaterial, mistake, that mistake may delay the hearing of an employee's claims.  While immaterial to the drafting party,

---

parties' agreement includes a delegation clause.  (See *Sanders v. Superior Court* (2025) 110 Cal.App.5th 1304, 1316–1318; *Cvejic v. Skyview Capital, LLC* (2023) 92 Cal.App.5th 1073, 1079; *Williams v. West Coast Hospitals, Inc.* (2022) 86 Cal.App.5th 1054, 1069; but see *Dekker v. Vivint Solar, Inc.* (9th Cir. Oct. 26, 2021, No. 20-16584) 2021 WL 4958856 [finding dispute to be within the scope of the parties' delegation clause].)  In such a case, section 1281.98 will entail further delay and expense, contrary to the goals of arbitration, as issues of material breach are litigated in court.

the ensuing delay associated with this minor error could be significant to the employee . . . ." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 707, *supra*, as amended May 20, 2019, p. 8.) In other words, late or incomplete payment was not a "mistake" that could be excused, as the majority has construed section 1281.98. Instead, the Legislature set out the process it did because it concluded the drafting party could better bear the associated costs.[4]

Finally, although the validity of section 1281.99 is not before us, that statute sheds light on the legislative intent question. Its text requires that a drafting party found to be in material breach "pay the reasonable expenses, including attorney's fees and costs, incurred by the employee or consumer as a result of the material breach." (§ 1281.99, subd. (a).) In addition to these monetary sanctions, however, section 1281.99 says the court may impose an evidentiary, terminating, or contempt sanction on the drafting party "unless the court finds

---

[4] The majority opinion dismisses these and similar statements in this committee report by suggesting they refer "primarily" to the bill's sanctions provisions (maj. opn. *ante*, at p. 28), but the statements were made in a discussion of sanctions *and* material breach. (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 707, *supra*, as amended May 20, 2019, pp. 8–9.) A concluding sentence confirms that the report's author was responding to both concerns: "In light of the extreme hardship that needlessly delaying arbitration may cause to plaintiffs, the *material breach* and sanction provisions of this bill would seem to be a strict yet reasonable method to ensure the timely adjudication of employee and consumer claims that are subject to arbitration." (*Id.* at p. 9, italics added.) As to specific concerns about the bill's harsh sanctions, the report was openly hostile to arbitration, suggesting that drafting parties might "lessen their risk of sanctions" by "reconsider[ing] their liberal use of binding arbitration provisions in contracts." (*Id.* at p. 10.)

that the one subject to the sanction *acted with substantial justification* or that other circumstances make the imposition of the sanction unjust." (*Id.*, subd. (b), italics added.) The exception thus presumes that a finding of material breach will result from a delinquent payment *even when the defaulting party acted with substantial justification.* It is difficult to square this provision with the majority's construction of section 1281.98.[5]

In short, nothing in the legislative history indicates section 1281.98 was limited to punishing only willful defaults. On the contrary, it appears the Legislature chose to enact a clear rule capable of expedient application. It was "not interested in any excuses, even reasonable ones, as to why" a payment might have been delayed (*Colon-Perez v. Security Industry Specialists, Inc.* (2025) 108 Cal.App.5th 403, 420), nor does it appear to have contemplated allowing litigation on this subject. Yet litigation will indeed result from the majority's interpretation of the statute, which rests highly consequential determinations of material breach and sanctions on whether the defaulting party

---

[5] The majority suggests a party that "acted with substantial justification" (§ 1281.99, subd. (b)) could refer to one who is prevented from losing its right to arbitrate by "the background statutes" (maj. opn. *ante*, at p. 27). This reading might be plausible if there were any hint in the language or legislative history of section 1281.98 that a delinquent party's material breach could be excused for any reason. There is none. More likely, the Legislature meant what it said: A drafting party who fails to pay on time is in material breach and "waives its right to compel the employee or consumer to proceed with th[e] arbitration as a result of the material breach" (§ 1281.98, subd. (a)(1)), even though the court may excuse those who "acted with substantial justification" from the harshest sanctions (§ 1281.99, subd. (b)).

acted in good faith. While the majority's construction may render the statute more palatable from a preemption standpoint, it does not appear to reflect a "fairly possible" reading of what the Legislature actually had in mind. (*Michael G.*, *supra*, 14 Cal.5th at p. 635.)

**B.**

Even accepting the majority's "harmonization" of section 1281.98 with certain statutory defenses, the problem remains that the statute enacts a presumption that time is of the essence in all consumer and employment arbitration contracts.

As noted, "absent an express provision in the arbitration agreement" to the contrary, the statute requires that arbitration providers make their invoices "due upon receipt." (§ 1281.98, subd. (a)(2).) "Any extension of time for the due date shall be agreed upon by all parties." (*Ibid.*) Then, if fees and costs are not paid in their entirety within 30 days after the due date, the drafting party is declared to be in material breach as a matter of law, with all the consequences that follow. (*Id.*, subd. (a)(1).) While parties may contract around the "due upon receipt" default rule, the statutory language permits *no* deviation from its 30-day grace period or its requirement that "all parties" agree to any extension of time (*id.*, subd. (a)(2)). Thus, even when an arbitration provider is willing to extend the time for payment *and continue with the arbitration*, the employee or consumer can withhold agreement, triggering the statute's material breach and sanctions provisions.

Reading these terms into all consumer and employment arbitration contracts effectively converts them into contracts making time of the essence as to the payment of arbitration fees.

The majority implicitly acknowledges this fact when it compares section 1281.98's timing rules to contracts that make time of the essence. (See maj. opn. *ante*, at p. 33.) But I question whether the California Legislature has the authority, consistent with the FAA, to establish a presumption that time is of the essence for a large subset of arbitration agreements. For all other contracts, the presumption is exactly the reverse: "The general rule of equity is that time is *not* of the essence of the contract, unless it clearly appear from the terms of the contract, in the light of all the circumstances, that such was the intention of the parties." (*Henck, supra*, 9 Cal.2d at p. 143, italics added; see 15 Williston on Contracts (4th ed. 2025) § 46.1.) Given that "[t]he 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced *according to their terms*' " (*Concepcion, supra*, 563 U.S. at p. 344, italics added), it is by no means clear that a statute may amend arbitration contracts by inserting a material term to which the parties did not agree.

The majority opinion attempts to avoid this difficulty by comparing section 1281.98 to contracts that have been construed to make time of the essence even though they contain no such express term. (See maj. opn. *ante*, at p. 33.) But the comparison does not survive scrutiny. The cases in which courts have inferred time to be of the essence absent a clear agreement to this effect all involve special circumstances not present here. For example, in cases involving contracts to purchase real property, courts have inferred the parties intend time to be of the essence because the "damage resulting to the seller by reason of delay in performance on the part of the purchaser cannot be estimated nor compensated." (*Henck, supra*, 9 Cal.3d at p. 144; see *Skookum Oil Co. v. Thomas* (1912) 162 Cal. 539, 546.) Similarly, time is of the essence by the very nature of an

option contract, because an option "by its terms must be exercised within a specified time." (*Rosenaur v. Pacelli* (1959) 174 Cal.App.2d 673, 676.) Courts cannot extend the time for performance of an option contract because to do so "would give the optionee, not the option he bargained for, but a longer and therefore more extensive option." (*Holiday Inns of America, Inc. v. Knight* (1969) 70 Cal.2d 327, 330.)[6] Arbitration contracts are different. A late payment of arbitration fees does not cause inestimable harm or defeat the very purpose of the contract. The majority cites no decision holding that time is of the essence, absent an express term, based on some unique characteristic of arbitration contracts.

Thus, even accounting for the statutory defenses to forfeiture the majority has grafted onto it, section 1281.98 disfavors consumer and employment arbitration agreements by making time presumptively of the essence. It flips the normal presumption that time is *not* of the essence without an express agreement to this effect. It also deprives parties of the ability to contract for a longer grace period or for extensions of time to be negotiated without the assent of every party involved in the case, even when no delay or interruption in the arbitration will possibly result. "Because [the statute] singles out arbitration

---

[6]     Indeed, even with option contracts, "a reasonable time" will be allowed for performance if the contract does not specify a deadline (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 346, 351), and what constitutes a reasonable time is determined from case-specific circumstances (see *Murfee v. Porter* (1950) 96 Cal.App.2d 9, 18). Section 1281.98 replaces that " 'reasonable time' " rule with a legislatively imposed date for performance untethered to " 'the circumstances of the particular case' " (*Murfee*, at p. 18).

agreements for disfavored treatment, . . . it violates the FAA."
(*Kindred, supra*, 581 U.S. at p. 248.)

## C.

The majority opinion concedes "that if section 1281.98 were construed to mean that any failure to make timely payment, regardless of the circumstances, invariably results in forfeiture of arbitral rights, the statute would be anomalous" with general contract law principles (maj. opn. *ante*, at p. 34) and "would raise preemption concerns" (*id.* at p. 30). It concludes preemption is nevertheless unproblematic because, by employing its harmonization analysis, "a drafting party can avoid forfeiture of its right to arbitration by showing that the delay was excusable under section 473, Civil Code section 3275, or Civil Code section 1511, the background principles that generally apply to other contractual obligations." (Maj. opn. *ante*, at p. 34.)

But there is one important "background principle[]" the majority leaves out. (Maj. opn. *ante*, at p. 34.) In addition to the statutory defenses to forfeiture discussed in the majority opinion,[7] California common law has long recognized a defense

---

[7] The majority opinion does not discuss Civil Code, section 1492, which provides: "Where delay in performance is capable of exact and entire compensation, and time has not been expressly declared to be of the essence of the obligation, an offer of performance, accompanied with an offer of such compensation, may be made at any time after it is due, but without prejudice to any rights acquired by the creditor, or by any other person, in the meantime." (Civ. Code, § 1492.) Although the statute would appear to excuse late performance when no prejudice has resulted, it presumably does not apply here because section 1281.98 makes time of the essence as a

15

*even for willful delinquencies*, so long as the other contracting party has suffered no significant prejudice related to the default.

In *MacFadden*, *supra*, 5 Cal.3d 809, the parties entered an installment contract for the sale of land. The buyer made monthly payments for more than 10 years but stopped after she discovered that timber had been removed from the property. (*Id.* at pp. 811–812.) More than two years later, with no resumption of the installment payments, the seller sued to quiet title. (*Id.* at p. 812.) In response, the buyer offered to pay the entire principal balance, with interest, and sought specific performance of the contract. (*Ibid.*) On review, we concluded the buyer was not entitled to relief under Civil Code section 3275, one of the statutory defenses discussed in the majority opinion, because the evidence established that her cessation of payments had been *willful.* (*MacFadden*, at p. 813.) The question then became whether there are any circumstances under which a party who has willfully breached a contract may nevertheless obtain specific performance. (See *ibid.* [noting Civil Code "section 3275 is not the exclusive source of the right to relief from forfeiture"].) To answer this question, we looked to a policy developed in the common law "that precludes any forfeiture having no reasonable relation to the damage caused by the vendee's breach *even when that breach is wilful.*" (*Id.* at p. 814, italics added; see *Freedman v. The Rector* (1951) 37 Cal.2d 16, 19–22.) We concluded this common law anti-forfeiture policy "also justifies awarding *even wilfully defaulting vendees* specific performance in proper cases." (*MacFadden*, at

---

matter of law. This is yet another way that the "flipped presumption" enacted by section 1281.98 disfavors arbitration agreements. (See *ante,* at pp. 12–15.)

p. 814, italics added.) We reasoned that, " 'when the default has not been serious and the vendee is willing and able to continue with his performance of the contract, the vendor suffers no damage by allowing the vendee to do so. In this situation, if there has been substantial part performance or if the vendee has made substantial improvements in reliance on his contract, permitting the vendor to terminate the vendee's rights under the contract and keep the installments that have been paid can result only in the harshest sort of forfeitures.' " (*Ibid.*)

We later reaffirmed *MacFadden* and held that, under certain circumstances, a willfully defaulting buyer has an "absolute right" to specific performance of the contract. (*Peterson v. Hartell* (1985) 40 Cal.3d 102, 106.) The availability of this equitable relief was not "contingent on any showing of facts that would mitigate the wilfulness or seriousness of the vendee's default." (*Id.* at p. 113.) Contrary to the majority's suggestion, nothing in the *MacFadden* opinion, or our reaffirmance of it in *Peterson*, purported to limit application of the anti-forfeiture principle to contracts involving the sale of real property. Nor have the courts understood it to be so limited. In one case involving the sale of a business, we observed that the anti-forfeiture "principle extends beyond real estate transactions and applies in a variety of situations to avoid unjust enrichment." (*Harriman v. Tetik* (1961) 56 Cal.2d 805, 811.) More recently, a Court of Appeal applied the principle to the sale of an airplane. (*Magic Carpet Ride LLC v. Rugger Investment Group, L.L.C.* (2019) 41 Cal.App.5th 357, 367–368 (*Magic Carpet*).) While acknowledging that *MacFadden* and related cases involved real property sales, the court saw "no reason why the rule . . . should be different for a contract for the

purchase and sale of an airplane."[8] (*Id.* at p. 368; see *Bird v. Kenworthy* (1954) 43 Cal.2d 656, 659–660 [applying principle to tractor sales contract but concluding equity did not favor relief].) Indeed, one court cited *MacFadden*'s anti-forfeiture rule as one of the equitable principles underlying the enforcement of *arbitration* contracts. (See *Saika v. Gold* (1996) 49 Cal.App.4th 1074, 1081–1082.)

Accordingly, common law permits an equitable remedy for willful delinquencies when the other party has suffered no prejudice. (See *MacFadden, supra,* 5 Cal.3d at pp. 813–815.) This remedy is available even when a contract makes time of the essence. (See *Magic Carpet, supra,* 41 Cal.App.5th at pp. 367–368.)

Although the majority opinion judicially amends section 1281.98's harsh terms by making them subject to various statutory defenses, it fails to account for equitable defenses that may apply in other contexts to excuse even a willful breach. This is no mere oversight. The equitable relief discussed in *MacFadden* cannot be simply appended to the list of defenses to section 1281.98 because allowing any defense to willful delays in paying arbitration costs would starkly contradict the Legislature's clear intent in enacting the statute. As the majority itself points out, Senate Bill 707 was expressly designed to punish and deter delays in arbitration that may

---

[8] Although evidence suggested the default in *Magic Carpet* was not willful (see *Magic Carpet, supra,* 41 Cal.App.5th at p. 364), the court did not mention Civil Code section 3275 or any of the statutory defenses discussed in the majority opinion. Instead, it focused on the equitable anti-forfeiture policies developed in *MacFadden* and other cases. (See *Magic Carpet,* at pp. 367–368.)

result from the intentional nonpayment of costs and fees. (See maj. opn. *ante*, at pp. 24–26.)

Allowing case-specific litigation of equitable defenses was certainly not what the Legislature had in mind when it enacted section 1281.98. And yet these defenses are generally available for other contracts, including those making time of the essence. (See *Magic Carpet, supra*, 41 Cal.App.5th at pp. 367–368.) In this way, section 1281.98 singles out arbitration contracts for disfavored treatment. In so doing, it violates the equal treatment principle and is preempted by the FAA.

## III.

I do not dispute that section 1281.98 was intended to address a real and vexing problem. The party holding the purse strings should not be permitted to delay the resolution of claims against it through a strategic refusal to pay arbitration costs. But by making arbitration contracts unenforceable on grounds that do not apply to other contracts, section 1281.98 runs afoul of the FAA. The Legislature might have achieved the same end with some version of section 1281.99 alone, allowing courts or arbitrators to impose monetary, evidentiary, or even terminating sanctions for tardy payments. Depending on their particulars, procedural rules such as these may well be held permissible because they would not interfere with the progress of arbitration and thus would not "undermine the goals and policies of the FAA." (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478.) The same cannot be said of section 1281.98, even with the majority's amendatory interpretation. Because I conclude section 1281.98 is preempted by federal law, I respectfully dissent.

**CORRIGAN, J.**


**I Concur:**

**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Hohenshelt v. Superior Court

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 99 Cal.App.5th 1319
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S284498
**Date Filed:** August 11, 2025

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Thomas C. Falls

---

**Counsel:**

Mayall Hurley and Nicholas F. Scardigli for Petitioner.

Arbogast Law, David M. Arbogast; Smoger & Associates and Gerson H. Smoger for Arbitration and Civil Procedure Law Professors as Amici Curiae on behalf of Petitioner.

Mara Law Firm and David Mara for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioner.

The Law Offices of Melinda Jane Steuer, Melinda Jane Steuer; and Leonard Steiner for Public Investors Advocacy Bar Association as Amicus Curiae on behalf of Petitioner.

Soderstrom Law and Jamin S. Soderstrom for Lionel Harper as Amicus Curiae on behalf of Petitioner.

Rob Bonta, Attorney General, Michael J. Mongan, State Solicitor General, Samuel T. Harbourt and Julie Veroff, Deputy State Solicitors

General, and Haley Amster, Associate Deputy State Solicitor General, for the California Attorney General as Amicus Curiae on behalf of Petitioner.

Seth E. Mermin, David S. Nahmias, MacKenna Alvarez; and Hannah M. Kieschnick for UC Berkeley Center for Consumer Law and Economic Justice, California Employment Lawyers Association and Public Justice as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Sanders Roberts, Reginald Roberts, Jr., Melvin L. Felton, Anand Singh, Ashley N. Bobo, Tyler S. Dobberstein; Bendon & Serlin, Wendy S. Albers and Kelly Riordan Horwitz for Real Party in Interest.

Gibson, Dunn & Crutcher, Jesse A. Cripps, Bradley J. Hamburger, Patrick J. Fuster and Lindsey K. Tanita for California Employment Law Council as Amicus Curiae on behalf of Real Party in Interest.

Mayer Brown, Andrew J. Pincus, Daniel E. Jones and Archis A. Parasharami for the Chamber of Commerce of the United States of America, the California Chamber of Commerce, the Restaurant Law Center and CTIA—The Wireless Association as Amici Curiae on behalf of Real Party in Interest.

McGuireWoods and Sabrina A. Beldner for the Retail Litigation Center, Inc., and the National Retail Federation as Amici Curiae on behalf of Real Party in Interest.

Eimer Stahl, Robert E. Dunn, Collin James Vierra and Jonathan Breit for the Manhattan Institute as Amicus Curiae on behalf of Real Party in Interest.

Seyfarth Shaw and Brian T. Ashe for Employers Group as Amicus Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nicholas F. Scardigli
Mayall Hurley P.C.
112 South Church Street
Lodi, CA 95240
(209) 513-9315

Julie Veroff
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3776

Melvin L. Felton
Sanders Roberts LLP
1055 West 7th Street, Suite 3200
Los Angeles, CA 90017
(213) 426-5000

Daniel E. Jones
Mayer Brown LLP
1999 K Street N.W.
Washington, DC 20006
(202) 263-3860